CAROLINE NORRIS HORWITZ *v.* SAFE DEPOSIT & TRUST COMPANY ET AL.

[Nos. 17, 18, April Term, 1937.]

*Decided May 24th, 1937.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Wilson K. Barnes,* for the appellant.

*Forrest Bramble,* for the Safe Deposit & Trust Company, appellee.

*Emory H. Niles,* for Moyra May Diana Henning, appellee.

*Nicholas G. Penniman, III,* submitting on brief, for Alice Andreozzi-Bernini and others, appellees.

*Frederick W. Brune* and *Semmes, Bowen & Semmes,* submitting on brief, for William C. Bullitt and others, appellees.

URNER, J., delivered the opinion of the Court.

The will of Orville Horwitz, who died in 1887, bequeathed to his brother, Theophilus Horwitz, the sum of $20,000 "to be invested safely in permanent securities

and the interest, rent and income thereof to be received and enjoyed by him during the term of his natural life," and the investments to become a part of the testator's residuary estate after his brother's death. The fund was invested by the life beneficiary in nine ground rents in Baltimore City, the title to which was conveyed to him with express reference to the limitations of the will. The life estate ended upon the death of Theophilus Horwitz in 1895, but his daughter, Caroline Norris Horwitz, was enabled thereafter to receive the income from those investments as the result of a voluntary and gratuitous provision to that end by the testator's widow, who had been devised and bequeathed interests in his entire estate, and by his four daughters, who were his residuary legatees and devisees. That purpose was accomplished by a written authorization to Alexander Yearley & Son, real estate agents, to collect and pay to Caroline Norris Horwitz, "until otherwise instructed," the net income from the ground rents in which the fund bequeathed by her father for life had been invested. The interests of the residuary legatees and devisees were defined, by the tenth paragraph of the will, as follows: "I give, devise and bequeath all the rest, residue and remainder of my Estate and Property of every sort and description, unto my four daughters, Florence, Louisa, Alice and Haller, to be equally divided between them, share and share alike, each of said shares to be held by the daughter to whom the same may be allotted for and during the term of her natural life, free and clear of any control over the same or of any interest therein of any future husband to whom she may be married and without any power or authority to her to dispose of or incumber the same in any way, but with full power to her to manage the said property, to collect in and receive all the rents, issues and profits thereof, and to receipt for the same; and with full power to her to dispose by last Will and Testament, or by any instrument in the nature of a last Will and Testament, of her said share, as fully as if she were a feme sole; and from and after the death of any one of my said daughters, if

she should die without executing the power herein granted to make a last Will and Testament, then, as to her said share, to be divided equally amongst the issue of her body lawfully begotten and living at the time of her death, (descendants of deceased children to take *per stirpes* and not *per capita*), but in the event of her dying without leaving issue living at the time of her death, then the said share shall be and become a part of my residuary estate and shall pass accordingly."

The widow of the testator died in August, 1914, his daughter Florence in September, 1918, and his daughter Louisa in January, 1919. After the death of Louisa a proceeding was instituted in the Circuit Court of Baltimore City for the partition of the large number of ground rents belonging to the residuary estate of Orville Horwitz, including those purchased with the fund which had been bequeathed to his brother for life. To effect an equal division among those entitled it was necessary to sell certain properties which were not susceptible of partition. The adult parties to the proceeding filed "Requests" that there should be invested so much of the proceeds of such sales "as may be necessary to purchase $24,000. par value of United States $4\frac{1}{4}\%$ Bonds for the purpose of providing, after deducting the trustee's commissions of 5% on the gross income, the sum of $969.00 per annum, to be paid to Caroline Norris Horwitz during her life, in quarterly payments on the first of January, April, July and October of each year and with a proportionate part from the last payment made to her down to the time of her death, the said sum of $969. per annum being the amount of annuity heretofore paid to her by the daughters of Mr. Orville Horwitz, deceased." Those requests were signed by the testator's daughter Alice, the wife of Count Pietro Andreozzi-Bernini, by his daughter Haller, the wife of Col. Ronald Brooke, and by the residuary legatees and devisees under the will of the testator's two deceased daughters, Florence, who at the time of her death was the wife of Count Renato Segalla di San Gallo, and Louisa, the widow of William C. Bullitt, each of the de-

ceased daughters having by their wills exercised the powers of appointment given them by their father's will as to the shares of his residuary estate in which they respectively had life interests. The will of Countess di San Gallo devised and bequeathed two-thirds of the portion of her father's estate over which she had a power of testamentary disposition to her three sisters, Louisa, Alice and Haller, the share of Louisa to be held for her in trust by the Safe Deposit & Trust Company of Baltimore, Maryland, and at her death to pass to her two sons or their heirs *per stirpes* absolutely. The remaining one-third of the appointed estate was devised and bequeathed to Maria Beatrice Andreozzi-Bernini, niece of the testatrix. There was also the following provision in the will of Countess di San Gallo: "I direct that my Executor pay over to my cousin, Caroline Norris Horwitz during her life time, through Messrs Alexander Yearley & Son, Real Estate Agents of said Baltimore, or in whatever may prove more convenient, the same annual sum of money which she has been receiving since the decease of her late Father out of my portion of the estate of my late Father. At her death said sum becomes a part of my residuary estate and passed accordingly."

By the will of Mrs. Bullitt all of her residuary estate and that over which she had a power of appointment under her father's will was devised and bequeathed to her sons, William C. Bullitt, Jr., and Orville H. Bullitt, and to Thomas Raeburn White, in trust for the benefit for life of such of her three sons as may be living at the time of her death, and for the widow then living of any son of the testatrix who may have predeceased her, with remainder to such persons as her sons respectively may appoint by last will and testament, or in default of such appointment to pass under the laws of Pennsylvania as if her sons had owned the estate absolutely and died intestate. In a preceding clause of her will Mrs. Bullitt had devised and bequeathed her interest in the ground rents in which the legacy for life to Theophilus Horwitz had been invested to Alexander Yearley & Son "in trust, to

collect and receive the rents, issues and profits thereof, and after deducting all proper charges and expenses to pay over the net income therefrom to" her cousin Caroline Norris Horwitz during her lifetime; and it was provided that after her death the interest of the testatrix in those ground rents should become a part of her residuary estate and as such should be held or distributed.

A petition filed by Caroline Norris Horwitz in the partition suit alleged that for many years her cousins Alice, Haller, Florence, and Louisa, daughters of her deceased uncle, Orville Horwitz, had been paying or directing the payment to her out of the undivided estate which they held for life with power of appointment, under their father's will, the sum of $969 per annum; that when her cousins Louisa H. Bullitt and Florence Horwitz di San Gallo died, each by her will directed the continuance of such payments as to their proportions. That the petitioner, as she was advised, had no legal interest in any of the properties mentioned in the partition proceedings, but, if she had any such interest, she waived it unconditionally; but that it was the express wish and intention of the parties to the suit, all of whom were her relatives, that she should continue during her life to receive as theretofore an annuity of $969 out of the estate, payable in proportion to their respective interests therein, and to that end had proposed and agreed that, in lieu of all other provision previously made for her, whether voluntarily or under any will or otherwise, there should, out of the proceeds of such properties as might be sold rather than divided, be paid over to the Safe Deposit & Trust Company of Baltimore, a sum sufficient to purchase $24,000 par value $4\frac{1}{4}$ per cent. U. S. government bonds, such sums to be contributed by the parties proportionately out of their respective interests, and out of the net income from the investment of such fund the trust company should pay an annuity of $969 to the petitioner in quarterly installments, and pay any surplus income to the contributing parties according to their respective interests, the principal sum invested to be paid to them after the petition-

er's death in the proportions stated in the petition, as follows:

To Alice Andreozzi-Bernini for life with re-
mainder as set forth in Article 10 of the
will of Orville Horwitz.                   9/36

To Haller G. Brooke for life with remain-
der as set forth in Article 10 of the will
of Orville Horwitz.                       9/36

To William C. Bullitt, Jr. ⎤
  Orville H. Bullitt        ⎥
    and             ⎬ Trustees   9/36
  Thomas R. White under   ⎥
  the will of Louisa H.     ⎥
  Bullitt, deceased      ⎦

To William C. Bullitt, Jr.          1/36
To Orville H. Bullitt            1/36
To Maria Beatrice Andreozzi-Bernini   3/36
To Alice Andreozzi-Bernini      2/36
To Haller G. Brooke          2/36

It was further stated in the petition of Miss Horwitz that, if for any reason there should be a deficiency of income, so that the net amount payable to her would be less than $969 per annum, it was the desire of all the parties that any such deficiency "should be made up and compensated out of such part of the principal sum so invested as may belong absolutely to the parties interested therein and shall not be the shares held by such parties merely for life by power of appointment."

Upon that petition the Circuit Court passed an order directing the auditor, in stating an account of the proceeds of any sales in the proceedings, to provide for the payment to the Safe Deposit & Trust Company of Baltimore, as trustee, of a sum sufficient to purchase $24,000 par value of 4¼ per cent. U. S. government bonds, such amount to be appropriated from the shares of the parties in the proportions of their respective interests and to be administered by the trustee as the petition proposed. The final decree confirmed that order, but provided further

"that after the death of the said Alice Andreozzi-Bernini, or the said Haller G. Brooke, respectively, the Safe Deposit and Trust Company, Trustee aforesaid, shall not pay over any part of the corpus of said investment, representing the *pro rata* share of the one so dying or any part of the income from such share except upon the further order of this Court. * * *" and "that in the event of the death of either of said life tenants before the death of the said Caroline Norris Horwitz, the interest or share in the principal of the said $24,000 of U. S. Government Bonds, belonging, in accordance with the terms of said order, to the one so dying absolutely, shall be chargeable until the death of the said Caroline Norris Horwitz for the payment of that proportion of the income which was previously payable out of the share held for life by the one so dying, unless this Court shall, upon such death, order and adjudge that said share so held for life shall itself continue chargeable with the payment of such income."

In pursuance of that decree the Safe Deposit & Trust Company of Baltimore received the specified amount of $4\frac{1}{4}$ per cent. government bonds and thereafter paid to Miss Horwitz for sixteen years the sum of $969 per annum, in quarterly installments, out of the income from that source. On August 7th, 1935, the trust company filed a petition in which it stated that Mrs. Brooke, who was a resident of England, died on February 2nd, 1932, but it had not until recently learned of her decease. The petition referred to the will of Mrs. Brooke, which exercised her power of appointment under the will of her father, Orville Horwitz, and provided that the estate, after the death of her husband, who predeceased her, should vest in Moyra Henning, her daughter. It was stated in the petition that the trust company had been advised by Mrs. Henning's representatives of her unwillingness to permit her interest in the estate to be held for the further purposes of the trust of which Miss Horwitz is the life beneficiary. Mrs. Henning is interested in one-fourth or nine-thirty-sixths of the fund as her mother's appointee, and

in two thirty-sixths as her legatee, the latter proportion representing the share acquired by her mother as an appointee of Countess di San Gallo. The principal purpose of the trustee's petition was to obtain instructions from the court in view of the fact that the persons interested in the trust fund "have and assert conflicting theories as to their respective rights and obligations."

The answer of Countess Andreozzi-Bernini and her daughter, Maria Beatrice (then Maria Benzoni), neither admitted nor denied the allegations of the petition, but submitted to such order or decree as the court might deem proper.

In the answer of Mrs. Henning it was alleged that "by a true construction of the agreement set forth in the petition filed in these proceedings on November 8th, 1919, and by the decree passed herein as a result thereof, and by the terms of the will of her grandfather, Orville Horwitz," the respondent "is now entitled to nine thirty-sixths (9/36) of the entire fund mentioned herein as an appointee of her Mother, Haller Gross Brooke, and is also entitled to all of the income thereon from February 2, 1932, the date of the death of her Mother, * * *" but is not "concerned with the use or disposition to be made of the two thirty-sixths (2/36) interest formerly held absolutely by her Mother * * * except insofar as there may be a surplus thereof after the fulfillment of the agreement set forth in said petition. * * *"

Miss Horwitz, the life beneficiary of the trust, asserted in her answer that she is entitled to have the whole of the trust fund retained by the trustee during the remainder of her life, and that, if the income should be insufficient to pay her an annuity of $969, the deficiency should be supplied from the corpus.

The trustees under the will of Mrs. Bullitt denied in their answer that Miss Horwitz is entitled to have any deficiency of income from the trust fund supplied from that part of the principal in which the respondents have an interest in remainder, or from those parts of the principal in which William C. Bullitt, Jr., and Orville H. Bul-

litt, who joined in the same answer, were interested as remaindermen. The last-named respondents, however, stated in the answer that they did not wish to stand upon any technical rights which they may be entitled to assert as against the claim of Miss Horwitz with respect to that part of the trust fund in which they have absolute interests in remainder, and that they assented to the use of the principal of each of the one thirty-sixth interests in the fund, to which they are respectively entitled, subject to her life estate, to make up any deficiency which may occur in the income from the fund to such extent as may be necessary to pay her $969 per year, provided that any charges against principal to make up any such deficiency shall be pro rated among all remainder interests in the corpus which may be voluntarily, or by decision of court, subject to such a charge.

The executors of the will of Mrs. Brooke filed an answer submitting the case to the court's decision so far as their interests might be involved.

After a hearing the court passed a decree to the effect:

(A) That the nine thirty-sixths share contributed to the trust fund by Mrs. Brooke out of the estate of her father, in which she had an interest for life with a power of appointment, became upon her death, and by virtue of her exercise of that power, the absolute property of her daughter, Mrs. Henning, who is entitled to receive that share from the trustee with interest from the date of her mother's death, less the usual commissions for collection, the amount of the income so payable being $957.60.

(B) That the net income from the nine thirty-sixths share contributed by Countess Andreozzi-Bernini to the trust fund shall be paid to Miss Horwitz until her death, or that of the countess, whichever shall first occur, at which time such payment of income shall cease, and thereafter the trustee shall not pay over any part of the corpus or the income from that share except upon the further order of the court.

(C) That the net income from the nine thirty-sixths

share to which the trustees under the will of Mrs. Bullitt are entitled in remainder shall be paid to Miss Horwitz during her lifetime, and upon her death such payment shall cease.

(D) That the net income from the nine thirty-sixths share owned absolutely as follows: William C. Bullitt, Jr., one thirty-sixth, Orville H. Bullitt, one thirty-sixth, Maria Benzoni, three thirty-sixths, Countess Andreozzi-Bernini, two thirty-sixths, and Haller G. Brooke, two thirty-sixths, or from such portion of that nine thirty-sixths share as from time to time remains in the hands of the trustee, shall be paid to Miss Horwitz during her lifetime, and the corpus thereof shall be chargeable *pro rata* among the shares of the respective parties interested therein for any deficiency in the income from which Miss Horwitz was previously paid $969 annually.

(E) That any income, at the rate of $969 annually, now due and unpaid to Miss Horwitz, shall be paid to her by the trustee, and if necessary such payment shall be made from the nine thirty-sixths corpus share mentioned in paragraph (D) of the decree; and that the trustee shall pay from that share of the corpus to Mrs. Henning the income to which she is entitled as provided in paragraph (A).

It was further decreed that after nine thirty-sixths of the trust fund is distributed to Mrs. Henning, another nine thirty-sixths share shall be divided from the corpus as the share mentioned in paragraph (D), so that, after payments out of that portion of the fund are made as provided in the decree, the deficiency to which paragraph (D) refers may from time to time be charged to the balance of that share.

The basic theory of the decree was that, in so far as the trust estate created in 1919 for the benefit of Miss Horwitz for life was provided out of funds in which the contributors had only interests for their lives, the trust could not be recognized as continuing after the expiration of their life estates, but that the trust continues for the full period of Miss Horwitz's life with respect to

funds which the contributors owned absolutely. In the first class of contributions were those made by Countess Andreozzi-Bernini and Mrs. Brooke out of funds derived from their father's estate, in which they had only interests for life with powers of appointment, and by trustees representing life estates under the will of Mrs. Bullitt, while in the second class were the funds furnished by the legatees under the will of Countess di San Gallo. The provisions of the decree in reference to charges against the corpus to make up deficiencies in the income were influenced by the agreement, as stated in the life beneficiary's intervening petition, "that any such deficiency should be made up and compensated out of such part of the principal sum so invested as may belong absolutely to the parties interested therein and not by the shares held by such parties merely for life by power of appointment. * * *"

Miss Horwitz is the only appellant from the decree. In support of her claim that the whole fund should continue to be impressed with the trust, it is argued that the Rule in Shelley's Case applies to the tenth paragraph of the will of Orville Horwitz, and that consequently the four daughters of the testator had an absolute right of disposition of the ground rents passing under that provision of the will from the proceeds of which properties the trust fund intended for the benefit of Miss Horwitz for life was derived. It is significant that the agreement creating the trust ignored such a theory, and we agree with the conclusion of the Circuit Court that the Rule in Shelley's Case is not applicable. After stating and supporting the view, in which we also concur, that the power conferred by the will upon the daughters to "manage" the estate devised and bequeathed to them for life did not vest in them any authority to charge a portion of it with the payment of an annuity to Miss Horwitz beyond the duration of their life interests, and in derogation of the interests in remainder, the opinion of Judge Frank proceeds as follows:

"The next, and perhaps the most vital, claim of Miss

Horwitz is that the Rule in Shelley's Case so operates in the case of the dispositions in favor of each of Orville Horwitz's four daughters as to vest in each of them a fee tail estate which by virtue of the provisions of the Maryland Statute to Direct Descents (Code, art. 46. sec. 1), is converted into a fee simple estate. *Miller, Construction of Wills,* sec. 350, page 988. The Rule in Shelley's Case was abolished in Maryland by the Act of 1912, ch. 144. As, however, Orville Horwitz died in July, 1887, the then prevailing law, including that Rule, must govern the legal operation and effect of his will. A statement of the Rule in Shelley's Case, frequently approved, is as follows: 'When a person takes an estate of freehold, legally or equitably, under a deed, will or other writing, and in the same instrument there is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality, to his heirs or heirs of his body, as a class of persons to take from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate.' *Miller, Construction of Wills,* sec. 35, page 990."

"Without repeating the complete verbiage of Article 10 of Orville Horwitz's will, it will be recalled that it makes disposition to each of his daughters (1) for and during the term of her natural life; (2) free and clear of any control over the same or of any interest therein of any future husband to whom she may be married. (3) It denies any power or authority to dispose of or incumber the same in any manner. (4) As we have seen it confers full power to manage the same and to collect and receipt for the income. (5) It confers full power of disposition by will. (6) After her death without executing the power of testamentary disposition 'then as to her said share, to be divided equally amongst the issue of her body lawfully begotten and living at the time of her death (descendants of deceased children to take *per stirpes* and not *per capita*)'. (7) If she leaves no issue living at the time of her death, her share is to become

a part of testator's residuary estate. (The numbers have been inserted. They do not appear in the will.)"

"The clearly expressed intention of the testator that she should 'hold for and during the term of her natural life' is wholly to be disregarded, if the other requisites of the application of the Rule are present. The Rule in this respect disregards and frustrates and overrides intention, however clear and peremptory. *Hughes v. Nicklas,* 70 Md. 484, 486, 17 A. 398; *Rhodes v. Brinsfield,* 151 Md. 477, 480, 135 A. 245. Nor does the interposition between the life estate and the remainder of the power of testamentary appointment prevent the operation of the Rule, provided only that the power has not been exercised. *Brown v. Renshaw,* 57 Md. 67; *Cook v. Councilman,* 109 Md. 622, 72 A. 404; *Miller, op. cit.,* sec. 351, page 994."

"If Orville Horwitz, in making the disposition, in default of the exercise of the power to will, 'to be divided amongst the issue of her body lawfully begotten and living at the time of her death (descendants of deceased children to take *per stirpes* and not *per capita*)' used 'issue' there in the sense of 'heirs of her body generally' then the Rule would apply, if its other requisites are present."

"Two matters thus require consideration:

"I. Is the life estate to the daughter 'of the same legal or equitable quality' as the estate in remainder to the issue?

"II. Is the term 'issue' here used in the sense of heirs of the body as a class of persons in succession from generation to generation and not as designating particular persons or classes of persons who would themselves become a new stock or new stocks of descent?"

The discussion in Judge Frank's opinion of the first of those points will not be quoted. No question was raised on appeal as to the correctness of his stated conclusion, in which we concur, that the estates for life and in remainder were of the same legal quality. *Barton v. Barton,* 32 Md. 214, 223; *Nevin v. Gillespie,* 56 Md.

320, 327; *McCrory Stores Corporation v. Bennett*, 159 Md. 568, 573, 574, 152 A. 258.

The opinion then discusses the second point as follows:

"Is the term 'issue' as used by the testator the equivalent of 'heirs of the body'?"

"In a deed at common law the word 'issue' was always a word of purchase and never a word of limitation. *Miller, Construction of Wills*, sec. 358, page 1011."

"In a will at common law 'issue' might be either, depending upon the context. But it was presumptively a word of limitation equivalent to 'heirs of the body.' 'Issue' was, however, regarded as more flexible than 'heirs of the body' and more easily restricted in its meaning by the other language employed. Generally in the absence of explanatory or qualifying words, 'issue' is held to be the equivalent of 'heirs of the body.' *Shreve v. Shreve*, 43 Md. 382, 395. *Miller, Construction of Wills*, sec. 358, p. 1012. As a word of limitation 'issue' signifies all of the descendants in all generations; as a word of purchase, it connotes a particular class of persons to take, who thus become a new stock of inheritance. *Timanus v. Dugan*, 46 Md. 402, 417."

"Had the devise and bequest in Mr. Horwitz's will been to each daughter for life and (omitting the intermediate provisions) then to her issue, 'issue' would be held equivalent to 'heirs of the body,' the Rule would have been applicable and the daughter would take a fee tail estate converted into a fee simple estate. *Dickson v. Satterfield*, 53 Md. 317, 321, 329. The actual provision, however, requires that the daughter's share 'be divided equally amongst the issue of her body lawfully begotten and living at the time of her death (descendants of deceased children to take *per stirpes* and not *per capita*).' Thus there are two departures from bald and naked use of the words 'issue lawfully begotten'; (a) in the requirement of an equal division and (b) in the restriction of issue to those 'living at the time of her death.' What effect do these prescriptions have upon the meaning of 'issue'? (a) 'Issue' as the synonym of 'heirs' would

result in the taking as coparceners and not as tenants in common. Coparceners constitute together but one heir. Co-tenants have separate interests. *Hoffar v. Dement,* 5 Gill, 132, 137; *Crisfield v. Storr,* 36 Md. 129, 152."

" 'It may be conceded, as contended in argument, that for most practical purposes in! this country, there is no real difference between coparceners and tenants in common, yet they are different as legal estates, and their qualities and: incidents are not the same. * * * They [the coparceners] all constitute but one heir.' *Gilpin v. Hollingsworth,* 3 Md. 190, 194. 'In wills' the Court goes on to say (3 Md. 190, at page 195), the expressions 'equally to be divided,' 'share and share alike,' 'respectively between and amongst them' have been held to create a tenancy in common, and so it was held that the expression in the will of Henry Hollingsworth 'to be divided amongst all my children, in equal shares and portions, to them, their heirs and assigns, forever' made them take as tenants in common and not in accordance with the common law rule, by the worthier title as heirs and coparceners."

"In *Fulton v. Harman,* 44 Md. 251, after the death of the life tenant, the will provided that the proceeds of the estate should be equally divided among his lawful heirs after deducting bequests already made and when the others became equal then the balance should be divided share and share alike. On page 264, the Court says: 'In the devise under consideration, as the words 'lawful heirs' are followed by words of partition and distribution inconsistent with the devolution of the estate by inheritance,' so it was held that this requirement prevented even the strong words 'lawful heirs' from having the effect of coalescing the remainders with the life estate pursuant to the Rule in Shelley's Case. *Fulton v. Harman, supra,* is a clearer case than that now before the Court, but its underlying principle has application here."

"It is further noteworthy that the phrase under discussion 'issue of her body lawfully begotten' is modified and restricted by the limiting words 'and living at the

time of her death.' This is an express restriction of 'issue' to those then living and completely negatives the idea that the word 'issue' was used in the required sense of all descendants in all generations. If the provision stopped here there could be no serious question of the narrow and limited sense in which the word 'issue' was used. It would describe a class of descendants closed by the death of the daughter and including only those living at the time of her death. Then in parenthesis are added the words 'descendants of deceased children to take *per stirpes* and not *per capita.*' That can refer only to the daughter's children deceased at the time of her death. It could not reasonably be applied to the descendants of then deceased grand children or great grand-children of the daughter. *Billingsley v. Bradley,* 166 Md. 412, 419, 171 A. 351. The context does not admit of that construction. If that is a correct interpretation, then instead of this disposition being a limitation to all the issue generally of the daughter, certain of such issue conceivably might and would be excluded from the class. Such a possibility precludes attributing to 'issue' here the meaning of 'heirs of the body'."

"Taking the provision as a whole, it limits the 'issue' to take to those living at the time of the daughter's death and the descendants of her then deceased children. Plainly these are limited classes of issue and not descendants indefinitely in all generations. The testator's intention thus was to prescribe a particular class of persons and not all descendants in all generations. In such a case 'issue' is not the equivalent of 'heirs of the body.' *Timanus v. Dugan,* 46 Md. 402, 417."

"*Shreve v. Shreve,* 43 Md. 382, 395, is a case quite unlike the present case on its facts, but the *ratio decidendi* there resembles that which I believe should govern this case."

"For the reasons given, I hold 'issue' as thus used by Mr. Horwitz, is not a word of limitation; that the remainders to these 'issue' do not coalesce with the life estates of the respective ancestors, and that the Rule in

Shelley's Case does not operate. This conclusion is determinative of all contentions based on the theory that the daughter of Orville Horwitz acquired fee simple estates under Article 10 of his will, and were consequently entitled by acts *inter vivos* to affect the corpus of the estate after their respective deaths."

With the reasoning and effect of the opinion thus quoted we are in full accord.

Certain theories of estoppel were advanced to support the appellant's contention as to the duration and scope of the trust. But the acceptance of those theories would require us to disregard the terms and interest of the trust agreement stated in the appellant's own intervening petition.

The decree has our approval in regard to all of its provisions.

This record also presents an appeal from an order authorizing the trustee to pay from the corpus of the trust a fee of $500 for professional services rendered by its solicitor. There is no sufficient ground for a conclusion that the allowance was excessive or that the fee is not properly payable out of the funds held by the trustee.

*Decree and order affirmed, with costs.*