# MAX SOKOL AND LOUIS ELIASBERG, Trustees
## v. RALPH A. NATTANS ET AL.

[No. 744, September Term, 1974.]

*Decided May 5, 1975.*

The cause was argued before ORTH, C. J., and DAVIDSON and LOWE, JJ.

*Delverne A. Dressel,* with whom were *Dickerson, Nice, Sokol & Horn* and *McKenney, Thomsen & Burke* on the brief, for appellants-cross appellees.

*Francis D. Murnaghan, Jr.* and *Benjamin Rosenberg* with whom were *Milton S. Schiller, Winston T. Brundige* and *Morton E. Rome* on the brief, for appellees-cross appellants.

ORTH, C. J., delivered the opinion of the Court.

This appeal concerns the trust under the Last Will and Testament of Arthur Nattans I, deceased. It presents two issues for decision. The first is raised on appeal by two of the three current trustees, Max Sokol and Louis Eliasberg.[1] The second is raised on cross-appeal by certain of the beneficiaries.[2] The issues stem from the matter of compensation to be allowed the trustees for the performance of their services. We set them out as presented to us:

> I. "Are the trustees entitled to the statutory termination commission of one half of one percent of the value of the corpus of the trust provided by Section 14-103 (e) upon final distribution of the corpus of the Nattans trust?"
>
> II. "Whether trustees under a testamentary trust should be allowed a counsel fee out of the income of the trust estate for services and expenses incurred in connection with an unsuccessful claim against the trust assets for a termination commission based on the value of the corpus of the trust."

1. Arthur K. Solomon, the third trustee, and also a beneficiary, disclaimed the right to appeal and denied the right of Sokol and Eliasberg to appeal. Some of the beneficiaries filed a motion to dismiss the appeal. Upon hearing, we denied the motion. The grounds for the motion and the reasons for our denial are fully set out in Sokol and Eliasberg v. Nattans, 23 Md. App. 600.

2. Ralph A. Nattans, Emanuel Hecht, Arthur Nattans, Roger Nattans, Albert Lowenthal, Jean Arthur Lowenthal, Elinor S. Multer, Aline H. Johnson, Barbara H. Cleveland, Paul W. Schatzkin, Arthur G. Schatzkin, Dorothy R. Schatzkin, Audrey N. Katz, and Ruth L. Creamer noted the cross-appeal. Ruth R. Creamer later withdrew as a cross-appellant.

Our answer to the first issue is no. Our answer to the second issue is that, in the unique posture of this case, the grant of the allowance by the chancellor will not be disturbed.

## STATEMENT OF THE CASE

The trust was created by Item Sixth of the will of Arthur Nattans I executed in 1903. It came into being in 1905 upon the admission to probate of the will and two codicils thereto.[3] About 1913 the administration of the trust was placed under the jurisdiction of the Circuit Court of Baltimore City, and remains there to this day. See Docket 53A (1913), folio 169, *et sequentia*. The will was twice judicially construed. *Ryan v. Herbert,* 186 Md. 453, decided 15 May 1946, and *Weller v. Sokol,* 271 Md. 420, decided 15 April 1974. By Item Tenth of the will, the trust ceased on 24 September 1972 upon the death of Arthur Nattans II as the last survivor of the testator's eight children. The matter of compensation and allowances to the trustees appears to be the last impediment to a closing of the trust estate, and, hopefully, when it is finally resolved, the trust will be laid to rest once and for all.

The sole asset of the trust created by Item Sixth of the will consisted of all of the stock owned by the testator of the Read Drug and Chemical Company of Baltimore City, now Read's Inc., consisting of 396 shares of the 400 shares outstanding.[4] The stock was bequeathed to three named trustees.[5] The will assured that there would be three trustees during the life of the trust by providing for the appointment of a successor trustee to take the place of any one of the trustees named or of any one of their successors who died or resigned. On 3 June 1974 the trustees filed a petition praying the passage of an order allowing them commissions for their services from 24 September 1972 to final distribution and compensation for making final

---

3. The codicils have no bearing on the issues before us.

4. Appellees' brief notes that the shares were converted to 1,081,080 shares by a 2,730-to-1 stock split declared by the company on 29 March 1974.

5. Jennie Nattans, the wife of the testator, Samuel L. Bachrach, a son-in-law of the testator, and W. Burns Trundle, a friend of the testator.

distribution. On 12 June 1974 the chancellor sent counsel a letter opinion giving his views as to the compensation to be paid and allowances made. He directed counsel for the trustees to prepare an order in accordance therewith, to send a copy to counsel for all parties and to those parties not represented, and to submit the order to the court for execution after reasonable notice had been given. On 3 July Forrest F. Bramble, Jr., Esq. and Delverne A. Dressel, Esq. filed a petition for the passage of an order authorizing the trustees to pay them a reasonable counsel fee. The petition set out that they were employed by the trustees to assist and advise the trustees with respect to the proper distribution of the trust estate. On the same date Sokol and Eliasberg, as two of the trustees, filed a petition for the passage of an order allowing counsel fees out of the proceeds of the trust estate to be paid to Dressel and Paul E. Burke, Jr., Esq. The petition stated that Bramble, one of the counsel for the three trustees, was unable to fully represent the interest of all of them in connection with the allowance of proper compensation for their services as trustees because Solomon, the third trustee and also a beneficiary under the trust, although agreeing to accept such compensation for his services as the court determined to be reasonable and proper, unlike Sokol and Eliasberg, had not suggested any measure of compensation, declined to participate actively in any hearing in connection with commissions, and refused to testify on behalf of the trustees. Therefore, Eliasberg engaged the services of Burke, and Sokol engaged the services of Dressel to represent them with respect to allowance of commissions.

On 5 July 1974 the chancellor issued an order. The trustees were (a) "allowed a commission payable out of income in an amount equal to 5% of the income of the trust from September 24, 1972 through July 15, 1974 as compensation for their labor and responsibility during such period"; (b) denied additional commissions; and (c) "authorized to pay out of income the sums of $10,075 and $8,686.32 to their counsel for services rendered as set forth in the petitions for payment of counsel fees." All parties were content with the

commissions allowed, at least to the extent that no challenge was made to them. Sokol and Eliasberg, however, were aggrieved by the denial of additional commissions and noted an appeal seeking to set aside that part of the order. Certain of the beneficiaries under the trust, although not questioning the payment of $10,075 as counsel fees, were unhappy with that part of the order with respect to the authorization to pay additional counsel fees of $8,686.32 to Burke and Dressel and filed a cross-appeal to have the order in that regard reversed. Thus, there is before us the propriety of the denial of the trustees' request for additional commissions and of the allowance of $8,686.32 as counsel fees as reflected in the issues for decision.

I

## THE FIRST ISSUE

### The Will

The will expressly fixed the compensation of the trustees originally named and their successors from time to time. Item Seventh read in its entirety:

"The said trustees shall receive for their services as such the usual commission of five per cent upon the annual income of said trust estate."

By Item Ninth, successor trustees were given "all the powers and duties together with the compensation as above provided in reference to the three trustees appointed by this will." The will was otherwise silent regarding compensation of the trustees.

Considering the provisions in the will with respect to compensation to the trustees under the firmly established principles controlling in the construction of wills, see *Veditz v. Athey*, 239 Md. 435, 448, and cases cited therein, and bearing in mind that what the testator meant must be gathered from what he said in his will, as viewed from the standpoint he occupied at the time of its execution, see *Boyd v. Boyd*, 24 Md. App. 497, 502.

We think that the testator intended that 5% upon the

annual income of the trust estate was to be all the compensation the trustees were to receive. In so construing the will we look to the status of the law at the time it was executed.

*Compensation Allowed by Custom and Law Prior to 1939*

Prior to 1939 there was no statutory provision for compensation to conventional trustees. The question as to commissions to be allowed testamentary trustees for services rendered was presented in *Abell v. Brady*, 79 Md. 94 (1894). The Court said, at 97-98:

> "It can hardly be necessary to say that in England no allowance is made, by way of compensation, to one holding a fiduciary relation for services rendered by him in the discharge of his duty as trustee, unless the instrument creating the trust provides for the payment of compensation. The principle on which the rule is founded, it has been said, is that he shall not make a profit out of his trust; and the reason of the principle is that he shall not be placed in a position where his interest may be opposed to his duty. The office of a trustee was considered as being one of honor and conscience, and having been selected by reason of some special confidence arising from the ties of kindred or friendship, he was presumed to have accepted it voluntarily from a sense of duty, and not with a view to pecuniary gain or profit."

*Sanderson v. Pearson,* 45 Md. 483, 484; *Northern Central R. Co. v. Keighler,* 29 Md. 572, 579; *Ringgold v. Ringgold,* 1 H. & G. 11, 83-84. The Court in *Abell* pointed out, however, that this rule, with the exception of two or three States, had never been adopted in this county. 79 Md. at 98. Maryland had not adopted it. In *Ringgold* it was contended that the court was not competent to allow commissions as compensation to a trustee for his trouble. The court thought otherwise. It believed that upon an equitable construction of the statutes allowing commissions to executors,

administrators and guardians and the principles on which those statutes were based, compensation ought to be allowed to a conventional trustee as a reasonable and just indemnity for services rendered by him in the discharge of his duties as trustee. 1 H. & G. at 84.[6] The Court stated in *Abell*, at 99, that as to conventional trustees, "the rule ordinarily is to allow 5 per cent upon the income." The Court added:

> "But this rule is by no means an inflexible rule. In prescribing the rate of commissions, courts will take into consideration the nature and character of the trust estate, and the time and labor required of the trustee in the execution of the trust. The estate in some cases may be of little value, and yielding but a small income, but involving at the same time, a good deal of labor in its care and supervision, and in such cases five per cent. might not be a just and reasonable compensation. On the other hand, where the income is very large, that rate might be considered as excessive. After all, it is a matter resting largely in the discretion of the court, its reason and judgment, taking into consideration all the facts and circumstances surrounding the trust." *Id.*[7]

E. Miller, *Equity Procedure* § 558 (1897) was in full accord: "In trusts under a will or deed, where the instrument does not fix a rate, the usual rule is to allow a commission of five per cent. upon the income, although other rates are sometimes fixed."

Thus, when the will here was executed, commissions were allowed a conventional trustee, as a general rule, by judicial

---

6. The Court observed, *id.*: "Yet, the English Courts grant *per diem* allowances, not in the nature of a compensation, but under the name of an indemnity. The difference then, in truth, is only in the mode of allowance, not in the principle. It is in fact, a mere difference in name. Commissions in a case like this, might very fairly be considered as only extending a just and reasonable indemnity for time bestowed in the management of the concerns of others. But if, indeed, there was a difference in principle, this Court would feel themselves justified in granting reasonable commissions."

7. In Abell the court below allowed a commission of 6¹/₂%. The Court of Appeals reduced it to 5%.

fiat, as a reasonable indemnity for services rendered by him in the discharge of his duties, although no provision for such compensation was made in the instrument creating the trust. "Such commissions will ordinarily be allowed where the trustee has performed his duty, unless its performance has imposed no labor or trouble which justly entitles him to compensation, or unless there is something in the nature of the trust itself, or in the terms of the trust instrument to show that no commissions were intended to be allowed or charged." Miller, *supra,* § 557. The commissions were based on income received, and the usual rate was 5% of such income, just as the testator here indicated.

No commissions based on the value of the trust assets were allowed. Miller said, § 561, citing *Jenkins v. Whyte,* 62 Md. 427, 434, 437; "When commissions are allowed on 'receipts and collections' the meaning is the receipts of income from the estate, not forming part of the principal; upon the principal, no commissions can be given." We observe that the testator here did not contemplate a sale of the trust corpus and reinvestment of the proceeds. There was no power given the trustees to sell the stock. *Weller v. Sokol, supra,* at 432.

It was neither the custom nor the law to allow compensation for terminating a trust. Although a trustee may have been allowed a commission on his disbursements, this meant expenditures during the existence of the trust, as distinguished from payments over to the *cestuis que trust. See Jenkins v. Whyte, supra,* at 436-437; *Whyte v. Dimmock,* 55 Md. 452, 454-456. The case of *Bash v. Bash,* in the Circuit Court of Baltimore City, decided 27 April 1905, and reported in 2 Baltimore City Reports 349, is persuasive on the point. Testamentary trusts were being administered under the jurisdiction of that court. The *cestuis que trust* became entitled to receive the corpus, which included securities which could readily be divided among them. The auditor stating the account for final distribution allowed the corporate trustee "the usual commission of 5 per cent on the income collected" since the last report. He also gave an allowance of $250 to it as "compensation for its services in

distributing and dividing the estate." There was objection to the latter. The question before the court was whether the trustee was entitled to this compensation. The chancellor, Harlan, C. J., held that it was not. He declared that the 5% allowed the trustee on the income was its "compensation for the general care and supervision of the trust estate" or, in other words, it was the commission "allowed for the general *management and settlement* of the estate." The chancellor noted, at 351: "The five per cent commission does not cover special and unusual services, and it is quite customary to allow extra compensation therefor among which are commissions on sales and original investments. But", he added, "I cannot find that it has been customary to allow extra compensation for distributing the trust estate to the parties entitled thereto at the termination of the trust, unless there were special circumstances justifying the same." He found no such special circumstances. "No decision has been produced wherein a trustee has ever been allowed special compensation for distributing an estate consisting of cash or securities, and the general understanding of the profession has been that such a service is included in the duties for which the usual commission is allowed trustees, and is not the subject of any extra allowance." Id.[8] *See A bell v. A bell,* 2 Balto. City Repts. 174.

We have been discussing the custom and law which prevailed when no compensation for services rendered by a conventional trustee was provided in the instrument creating the trust. "If the instrument creating the trust provides for a certain rate of compensation, that rate will in general be allowed. Thus a trustee appointed by a will is entitled to the commissions provided for by the will. . . ." Miller, *supra,* § 559. Comment f to § 242, *Restatement (Second) of Trusts* (1959) [9] at 607, is in accord: "If by the

---

**8.** The chancellor explained: "Some instances have been pointed out wherein in the last few years in our Circuit Court here, such fees have been allowed; but in none of these cases has any objection been raised to the allowances, and they cannot, therefore, be regarded as binding precedents; in some of them, moreover, there were special circumstances justifying the additional remuneration." *Id.*

**9.** Section 242 provides: "Except as stated in § 243 [Effect of Breach of Trust on Compensation], the trustee is entitled to compensation out of the

terms of the trust it is provided that the trustee shall receive a certain amount as compensation for his services as trustee, he is ordinarily entitled to that amount. . . ." [10] But it goes further, adding "and, unless it is otherwise provided, he is ordinarily entitled only to that amount." [11] Comment f to the effect that a trustee is ordinarily entitled only to the compensation provided for in the terms of the trust, is discussed in Annot., 19 A.L.R.3d 520, 523-524 (1968): "The larger portion of the decisions on this point, however, have limited the fiduciary to the compensation fixed in the will, trust instrument, or other agreement on the basis of a contractual theory that by accepting the office and qualifying as such fiduciary, he accepted the provision fixing his compensation and is bound thereby. It is also evident that if the services for which extra compensation is claimed are only such services as are incident to the duties of the office, or are such as were contemplated by the testator, or fiduciary, the latter will be limited to the compensation provided by the instrument on the theory that the fees so fixed were intended as full compensation for the rendition of such services. However, where it appears that the fiduciary has performed extraordinary services for the trust or estate, beyond those contemplated by the parties or ordinarily incident to the duties of such fiduciary the court may award such additional fees as are reasonable compensation for those services."

---

trust estate for his services as trustee, unless it is otherwise provided by the terms of the trust or unless he agrees to forego or waives compensation."

**10.** Comment f at 607-608 declares: "It is a question of interpretation whether a provision that the trustee shall receive a certain amount as compensation is applicable only to the original trustee named by the settlor or whether it is applicable also to successor trustees. If it is applicable to successor trustees, such trustees are not entitled to greater compensation, unless it is determined by the court that it is impossible or impracticable to find a person properly qualified who is willing to act as trustee for such compensation." In the case *sub judice*, as we have indicated, the will expressly sets out in its Ninth clause that successor trustees shall receive the same compensation as provided for those originally appointed by the will. And it is patent that the compensation was not so inadequate as to make it impracticable to find persons properly qualified to act.

**11.** The comment notes an exception: "If the amount of compensation provided by the terms of the trust is so inadequate that no duly qualified person would be willing to act as trustee for the compensation so provided, the court may authorize a larger compensation, since otherwise the purposes of the trust would be defeated or substantially impaired."

This was all summed up in *Schloss v. Rives,* 162 Md. 346, 350-352 (1932). The Court set out certain propositions which it found from its many decisions dealing with the allowance of commissions to executors, administrators, and trustees to be established as the settled law of Maryland. We give an abstract of the Court's summary, which it deduced from its previous decisions, with respect to conventional trustees:

(1) "[T]he early English rule in respect to the non-allowance of commissions to conventional trustees, unless the instrument creating the trust provided for compensation, is not the rule that has prevailed in Maryland; . . . compensation should be allowed to a conventional trustee as a reasonable indemnity for services rendered by him in the discharge of his duties, although no provision for such compensation is made in the instrument creating the trust."

(2) "[W]here the compensation of a conventional trustee is fixed in the instrument making the appointment, the same will ordinarily and generally be allowed."

(3) "[T]he allowance of commissions to trustees, when the trust is administered under the control and supervision of the court, is largely within the discretion and judgment of the court, and is to be determined from all the circumstances of the particular case, taking into consideration the amount of labor required, the amount of risk incurred, the character of the duty to be performed, the time and attention necessary to be bestowed upon it, and the amount of the estate which is the subject of the trust; in other words, the compensation is upon the basis of a *quantum meruit,* and is to be such an amount as will fairly and justly compensate the trustee for the services rendered. . . Where rules of court or

> established practice fix the rate of commission, [as would be the case where compensation to be allowed is provided in the instrument creating the trust], they should be followed and enforced; but, even in such cases, keeping in mind that the character, quality, and extent of the service is what is being allowed for, the chancellor in extraordinary cases has the authority to diminish or increase the usual allowance."

We see nothing in the will to indicate that the trustees would be called upon to perform services which were not incident to the duties of their office as contemplated by the testator.[12] The testator unequivocally declared that the compensation he set out was to be received by the trustees "for their services as such." It was the posture of the law then that when the instrument creating the trust fixed the compensation for the services of the trustee, a person accepting the trust was entitled only to that compensation, except, perhaps, as to extraordinary services not within the contemplation of the parties. Here the trust estate consisted of practically all the shares of stock in one corporation. The trustees were given no power to sell the shares. It had to be within the contemplation of the parties that the trustees would make distribution of the stock at the termination of the trust as a service incident to the duties of their office, and not as an extraordinary service. It is, therefore, that we conclude that the compensation fixed by the testator was intended to be all the compensation to which the trustees were entitled. The compensation so fixed was in full accord with that allowed by custom and law when the instrument creating the trust was silent as to compensation.

---

**12.** Item Eighth of the will declared that it was the testator's will "that the person who may be elected president of said Read Drug and Chemical Company after my death, shall hold that position without salary or compensation, and my trustees, who will hold the legal title to the great bulk of the stock of said Company are directed to see this provision of my will carried out." There is no indication that observance of this direction required any extraordinary services. No claim for compensation is predicated thereon.

*Statutory Provisions*

We have indicated that compensation allowed conventional trustees is now covered by legislative enactment. The first such statute was enacted by ch. 100, Acts 1939, effective 1 June 1939. It was amended by ch. 36, Acts 1951; ch. 216, Acts 1963; ch. 269, Acts 1972. It was revised by ch. 11, Acts 1974, § 2. It has appeared under the "Chancery" title of Art. 16 of the various codes — as § 268B, Code 1924; § 280, Code 1939; § 297, Code 1951; § 199, Code 1957. It is now § 14-103 of the Estates and Trusts Article. The scheme for payment of compensation has remained the same since the initial statute. That is, from the first, commissions were payable at certain percentages on designated amounts of income collected in each year, on the fair value of the corpus held in trust at the end of each year, and on the sale of real or leasehold property. Upon final distribution there was "an allowance commensurate with the labor and responsibility involved in making such distribution", which "in the absence of special circumstances" was to be equal to one-half of one per cent upon the value of the corpus so distributed. The amendments, for the most part, simply increased the percentages authorized and established new amounts to which the percentages applied, and changed accordingly the date from which the new rates were accountable as to trusts already begun before the enactment of the amendment. From 1939 on, the various statutory authorizations for payment of commissions to trustees were "subject to the provisions of any valid agreement determining their compensation." It was also expressly stated, until the stylistic revision in 1974, that the statutory commissions were "in lieu of such commissions as have been heretofore allowed for such services by custom or by law." It was made manifest in the original statute and preserved in the amending statutes from time to time that the allowance of compensation as authorized was in the sound discretion of the court. The commissions were "subject to be increased or diminished for sufficient cause by any Court having jurisdiction over the administration of such trust, and the

allowance of special commissions or compensation for services of an unusual nature. . . ." The allowances upon final distribution were "subject to revision or determination by any court of equity having jurisdiction. . . ."

We set out Estates & Trusts Art. § 14-103, which, according to the Revisor's Note formerly appeared as Art. 16, § 199. "The subsections remain in their former order but are rewritten for the purpose of making each a complete sentence. The only other changes are in style and language." The statute as revised reflects the statutory scheme as it has existed since 1939.

Section 14-103 (a) states the general rule:

"A testamentary trustee and trustee of any other trust whose duties comprise the collection and distribution of income from property held under a trust agreement or the preservation and distribution of the property are entitled to commissions provided for in this section for their services in administering the trusts. The amount and source of payment of commissions are subject to the provisions of any valid agreement. Any court having jurisdiction over the administration of the trust may increase or diminish commissions for sufficient cause or may allow special commissions or compensation for services of an unusual nature."

Subsection (b) concerns "income commissions":

"Accounting from July 1, 1972, whether or not the trust was in existence at that time, income commissions are

(1) 6 percent upon all income from real estate, ground rents, and mortgages collected in each year.

(2) 6 percent upon the first $10,000 of all other income collected in each year, 5 percent upon the next $10,000, 4 percent upon the next $10,000, and 3 percent upon any remainder.

Income commissions shall be paid from and chargeable against income. Income collected

includes any portion of income payable to a trustee but withheld by the payor in compliance with any revenue law."

Subsection (c) provides for "corpus commissions":

"Accounting from July 1, 1972, whether or not the trust was in existence at that time, commissions are payable at the end of each year upon the fair value of the corpus or principal held in trust at the end of each year as follows:

(1)  One third of one percent on the first $250,000,

(2)  One fifth of one percent on the next $250,000,

(3)  One eighth of one percent on the next $500,000, and

(4) One twelfth of one percent upon any excess. Corpus commissions shall be paid out of and chargeable against the corpus.

If a trust terminates, with respect to all or any part of the corpus held in trust in the course of any year, the commission for that year shall be reduced or prorated according to the part of the year elapsed and the amount of corpus as to which the trust terminates, and be chargeable, for such part of a year (and with respect to any such part of the corpus) at such termination of the trust, upon the then value of the corpus."

Subsection (e) deals with "final distribution":

"Upon the final distribution of any trust estate, or portion of it, an allowance is payable commensurate with the labor and responsibility involved in making the distribution, including the making of any division, the ascertainment of the parties entitled, the ascertainment and payment of taxes, and any necessary transfer of assets. The allowance is subject to revision or determination by any court of equity having jurisdiction. In the absence of special circumstances the allowance

shall be equal to one half of one percent upon the fair value of the corpus distributed." [13]

## The Decision

A trustee does not automatically get the commissions and allowances authorized by the statutes. He is "entitled" to them, and for the statutory provisions to apply, he must duly claim them "in lieu of such commissions as have been heretofore allowed for such services by custom or by law." It appears that the trustees from time to time under the Nattans' will did not invoke the statute to obtain compensation for their services rendered prior to 24 September 1972 when the trust terminated. Thus, they were recompensed as designated by the will and effectively waived, as to the periods for which they were paid, any rights they may have had to the statutory rates. As we have seen, the statute was last amended as to substance effective 1 July 1972 whereby the commissions and allowances now in effect were established. The amendment entitled the trustees to commissions as therein authorized in lieu of such commissions as had been theretofore allowed for such services by custom or by law, accounting from 1 July 1972. The commissions authorized were at certain percentages on designated amounts of income collected in each year and upon the fair value of the corpus held in trust at the end of each year. The statute also authorized an allowance upon final distribution of the trust estate. When the trustees filed their petition for compensation on 3 June 1974, Sokol and Eliasberg [14] suggested three alternatives to recompense them for their services from 24 September 1972 to final distribution. The first was that they be paid as provided in the will, that is at the rate of 5% on the annual income. Under this alternative the provisions of the statute with respect to commissions were waived. The second was that they be paid at the rates set out in the statute with respect

---

**13.** Subsection (d) provides commissions on sales of real or leasehold property.

**14.** Solomon, the third trustee, did not desire to suggest any measure of compensation, but agreed to accept such compensation for his services as the court determined to be reasonable and proper.

to income received and with respect to the fair value of the corpus. This alternative invoked the commissions provisions of the statute and waived the provisions as to commissions set out in the will. The third alternative was that they be paid at the rate of 5% on the income as provided in the will and a commission on the fair value of the corpus held in trust at the end of each year. This alternative waived the statutory commissions on income received but invoked the statutory provision as to commission on corpus. They sought, in addition, to invoke the statute with respect to allowances upon termination of the trust, asserting that they were "willing to accept an allowance equal to one-half ($^1/_2$) of one per cent (1%) of the value of the corpus of the trust estate being distributed as is set forth in Article 16, § 199 (e), of the Annotated Code of Maryland, or such additional amounts" as the court deemed reasonable and proper.

As we have indicated, a testamentary trustee is not absolutely entitled to the commissions and allowances set out in the statute. The designated rates on commissions are subject (1) "to the provisions of any valid agreement" and (2) "to be increased or diminished for sufficient cause by any court having jurisdiction over the administration of such trust." The allowance on final distribution of the trust, which "[i]n the absence of special circumstances . . . shall be equal to one-half of one percent upon the value of the corpus so distributed", is "subject to revision or determination by any court of equity having jurisdiction in the premises."

As we have also indicated, the chancellor allowed the trustees a commission payable out of income equal to 5% of the income of the trust from 24 September 1972 through 15 July 1974 "as compensation for their labor and responsibility during such period." This fully complied with the first alternative suggested by Sokol and Eliasberg. Therefore, they may not complain regarding it, and, indeed, do not complain. The chancellor denied "the trustees' request for additional commissions." Sokol and Eliasberg are aggrieved by this insofar as it precludes an allowance which they sought upon final distribution of the trust estate.

We look at the chancellor's reasons as expressed in his letter opinion for his determination of the matter of compensation. He opined that the provisions of the will did not constitute a "valid agreement" within the meaning of the statute.[15] We accept this for the purpose of decision, but expressly do not decide the issue at this point of the opinion because there is no need now to reach it. It necessarily follows that the statute was applicable and that the trustees were entitled to an allowance upon final distribution of the trust estate. This allowance, "in the absence of special circumstances", shall be equal to $1/2$ of 1% of the value of the corpus distributed. But if there are special circumstances, the amount of the allowance is in the sound discretion of the equity court exercising jurisdiction. In such event, the special circumstances, according to what they are, may justify the court allowing more than the $1/2$ of 1% or less than that, including no allowance at all. In any event, the statute makes clear that the allowance shall be "commensurate with the labor and responsibility involved in making the distribution, including the making of any division, the ascertainment of the parties entitled, the ascertainment and payment of taxes, and any necessary transfer of assets." The chancellor here recognized all this in his letter opinion. He said:

> "There would appear to be no basis for terminating income commissions as of the death of the last life tenant since none of the responsibilities of the trustees then ceased and they will necessarily continue until distribution. One cannot minimize the responsibility of trustees holding virtually all of the outstanding stock of a business enterprise and under no circumstances could they be expected to discharge these responsibilities without compensation. On the other hand, it is clear from the evidence and it is found as fact that the trustees

---

**15.** The chancellor observed, however, that the commission of 5% on the income "is in accordance with the express provisions of the will and therefore within the expectation of the testator."

have had no increased responsibilities or work subsequent to the death of the life tenant of sufficient magnitude to warrant any compensation in addition to the 5%."

Noting that the rate of $1/2$ of 1% of the value of the corpus is applicable in the absence of special circumstances, the chancellor continued:

"The basic standard for determining the distribution commission is that it be 'commensurate with the labor and responsibility involved in making such distribution'. In view of the size of the income commission and the minimal additional work attributable to distribution, there is insufficient labor to warrant compensation in addition to the income commissions. In the peculiar circumstances of this case the responsibility of the trustees has been substantially the same since the death of the life tenant as it was before his death and the income commissions adequately compensate for this responsibility.

"The percentage commissions provided for in § 199 were determined by the legislature to represent fair compensation in the ordinary case. Experience has taught that allowance of percentages of income and corpus value is a practical and fair way of compensating fiduciaries. However, a fiduciary's compensation, particularly when the fiduciary estate is subject to the supervision of the court, must always be based on actual labor and responsibility. This is obviously the reason that the legislature provided in § 199 that all commissions were subject to determination by a court having jurisdiction."

Where the court below orders an allowance upon final distribution of the trust estate in an amount greater than or less than that equal to $1/2$ of 1% of the value of the corpus so distributed, or, as is the case here, denies any allowance, and

the issue is preserved for appeal, our function on appellate review is to determine whether the chancellor was clearly erroneous in its judgment on the evidence that special circumstances existed, and, if they did, that they warranted the action he took. Maryland Rule 1086. We have reviewed the record and find that there was evidence supporting the chancellor's findings of fact. On the findings of fact, there was legally sufficient evidence for a determination that there were special circumstances of such a nature that the labor and responsibility involved in making final distribution did not call for an additional allowance. We cannot say that the view of the chancellor that the commissions allowed were commensurate with the labor and responsibility involved in all the duties the trustees performed was wrong. We note that by the nature of the trust assets, not much was required to make division and distribution, and that the parties entitled to distribution had been judicially determined. We conclude that the judgment of the chancellor on the evidence was not clearly erroneous. The part of the order denying additional commissions could be affirmed for that reason.

In reaching the conclusion that the chancellor was not clearly erroneous in his judgment on the evidence, we found no need to decide whether the provision for compensation set out in the will was a valid agreement in the contemplation of the statute. We suggest, however, an alternative reason why that part of the order denying additional commissions could be affirmed, and this reason encompasses a determination of whether the provisions in the will were a valid agreement binding on the trustees. The chancellor gave no reasons why he believed the provisions in the will regarding compensation did not constitute a "valid agreement" within the meaning of the statute. But, as we have seen, there is substantial authority that the fiduciary is limited to the compensation fixed in the will on the basis of a contractual theory that by accepting the office and duly qualifying, he accepted the provision fixing his compensation and is bound thereby, at least in the absence of extraordinary services beyond those contemplated or not ordinarily incident to the

duties of such fiduciary. It may well be that the current trustees by accepting the office, especially in the light of their acceptance thereafter of compensation in accordance with the will, became bound by the provisions fixing compensation in the will. But even if the acceptance of the office did not at the time constitute a valid agreement to abide by the will's provisions, we think that what occurred after the death of the last life tenant certainly made the provisions in the will a valid agreement. Sokol and Eliasberg expressly and Solomon tacitly as a first alternative suggested that their compensation for the period 24 September 1972 to final distribution be at the rate of 5% on annual income received as fixed in the will. We have also seen that it was the intention of the testator that this be all the compensation to be received by his trustees. Although the trustees also requested a termination allowance, they did not predicate their suggestion that their compensation be as fixed by the will upon a grant of the termination allowance. One of the reasons why the chancellor accepted the suggestion that commissions be in an amount equal to 5% of the annual income was that it was "within the expectation of the testator." We think that upon the acceptance by the chancellor of the trustees' suggestion, the provisions in the will did become a valid agreement so that unless extraordinary services were performed not contemplated in the agreement and beyond the usual duties of the trustees, the compensation of the trustees was without the statute as subject to the "valid agreement." For that reason, the part of the order denying additional commissions could be affirmed. We affirm it.

## II

### THE SECOND ISSUE

As has been indicated, on 3 July 1974 Sokol and Eliasberg filed a petition for allowance of counsel fees to Burke as attorney for Eliasberg and Dressel as attorney for Sokol, and for expenses incurred in the efforts of those two trustees to obtain compensation for their services as trustees. It was

alleged that Bramble, one of the attorneys for the three trustees, "was unable to fully represent the interest of all the trustees" because of the position of one of the trustees, Solomon. It was suggested that the fair and reasonable value of Burke in such representation of Eliasberg was $6,670.00 and that the fair and reasonable value of the services of Dressel in his representation of Sokol was $2,016.32. On 5 July 1974 certain of the beneficiaries filed an answer to the petition.[16] The same date the chancellor issued the order which included an allowance of the counsel fees as suggested, to be paid out of the income of the trust estate.

From the record submitted the only information as to what occurred with respect to the petition and answer before the issuance of the order allowing the fees must be gleaned from a transcription dated 8 July 1974. On that date the chancellor dictated to the court reporter the grounds for his decision. It is from this we learn that there was a hearing on the matter. No transcript of the proceedings of the hearing is included in the record. The chancellor reported that the hearing began on the morning of 5 July 1974 with the proceedings on the record. The hearing was not concluded that morning and did not resume until 6:00 p.m. that evening when a reporter was not available. The chancellor observed: "No one objected to concluding the hearing off the record." We do not know who was present at the hearing in person or by representation. According to the chancellor there was no objection to the counsel fees in the amount of $10,075 to Bramble and Dressel for the period preceding the proceedings involving objections to the trustees' commissions.[17] But all the beneficiaries, the chancellor noted, objected to the counsel fees for Dressel and Burke for services rendered in connection with the proceedings for determination of trustees' commissions for the period

---

16. Barbara H. Cleveland, Paul G. Schatzkin, Arthur W. Schatzkin and Dorothy R. Schatzkin filed an answer.

17. The chancellor explained: "Indeed, counsel for all beneficiaries who are represented consented to the amount, agreeing it was reasonable, and the Court was advised by Mr. Bramble that Dr. Hecht, the only beneficiary whose appearance was entered and who was not represented by counsel, had also agreed to the reasonableness of the fee."

following the death of the life tenant. He listed their objections as made in three aspects:

1) to the total fees on the ground that the trustees had not sought prior approval of the court for employment of counsel as required by Maryland Rule V77; [18]

2) to counsel fees in respect to contested commissions, "although it was conceded on behalf of the beneficiaries that, at least to the extent that the Trustees had been successful, they were probably entitled to reimbursement";

3) to the time spent by counsel—107 hours by Burke and 35 hours by Dressel on the ground that such time was excessive.

The chancellor said that, after "all counsel had been fully heard", he determined to allow the full amount of the fees requested in the aggregate amount of $8,686.32. He gave his reasons as to each objection, but we are concerned only with the objections with respect to the second aspect because it was only that aspect which is involved in the cross-appeal as argued by the beneficiaries.[19] The chancellor said:

---

18. Rule V77 a 11 provides that a fiduciary may employ an attorney for reasonable compensation to advise or assist him in the performance of his administrative duties, "but no attorney's fee, in an amount exceeding fifty (50) dollars, shall be paid in a . . . fiduciary estate administered under court jurisdiction unless the amount thereof has been first approved by order of the court."

Rule V77 b 2 reads: "A fiduciary administering an estate under court jurisdiction shall not make any expenditure or incur any obligation with respect to the prosecution or defense of any litigation, unless, for good cause shown, the court has first authorized him to do so."

19. With regard to the first aspect the chancellor said:

"With respect to Maryland Rule V 77, the Court would have approved engaging counsel had approval been requested, and, therefore, applying the usual principle, the Court will ratify that which it would have approved had approval been timely sought, particularly in this case, since counsel may well have been misled by the Court at the outset of the proceedings. On October 1, 1972, before the Bill of Complaint seeking instructions was filed, Mr. Dressel applied to the Court for approval of employment of counsel with respect to filing the Bill of Complaint, and the Court at that time, not having Rule V 77 in mind, informed Mr. Dressel that it was the Trustees' responsibility to make the determination. Thus,

"The issue with respect to whether or not the Trustees were entitled to reimbursement for counsel fees in connection with the contest over commissions was more difficult of resolution. The general rule seems to be that a trustee is entitled to be reimbursed for reasonable expenses, including counsel fees, in a successfully defended surcharge action brought by beneficiaries and in successfully defending exceptions filed by beneficiaries with respect to reimbursement of expenses. The argument made here was that, at best, the Trustees had been partially successful in their claim for commissions, and the suggestion was that they should be allowed only a proportionate part of the total counsel fees. The difficulty at the outset is in determining in what proportion the fees should be allowed. Although it could be argued that the Trustees were successful as to income commissions and unsuccessful as to a termination commission, this is not exactly what happened. What the court determined on the application for commissions was essentially fair compensation for the Trustees for all work done during the period between the death of the life tenant and distribution of the trust estate. Some of the beneficiaries, at least, contended that the Trustees were not entitled to any commissions during this period, and, on the

---

although counsel as well as the Court should be aware of the Rules, Mr. Dressel would have been justified in anticipating that the Court would have taken the same position with respect to employment of Mr. Burke in connection with the contest over the Trustees' commissions as it had on October 1, 1972."

As to the third aspect, the chancellor found, "considering all the circumstances, including the novelty of the legal issues and the investigation of the facts," that "the time spent did not appear to be out of line." He observed that no one objected to the hourly rates used by counsel.

In their brief the beneficiaries assert that the objections cited by the chancellor were "some, but not all, of the beneficiaries' objections to the allowance of a counsel fee out of the assets of the trust estate for services in connection with the compensation proceeding." On the state of the record, we do not know what other objections were made at the hearing.

other extreme, the Trustees contended they were entitled to full income commissions at the rate of five percent, as well as one-half of one percent of the value of corpus as a termination commission under Article 16, Section 199. The central issue before the Court was the applicability of this statute to this pre-1939 Will. Much of the legal work performed by counsel bore directly on this central issue. Therefore, it is impossible to accurately separate that work which pertained solely to the commission granted from that work which pertained to the commission which was denied. There would appear to be little or no justification for making an arbitrary division. The philosophy behind the Rule permitting reimbursement to the Trustees is that trustees should be fairly compensated for their work, and are entitled to reimbursement for all expenses reasonably incurred in connection with the administration of the trust. Thus, if a trustee is required to pay his own legal expenses whenever his right to compensation is contested, there is a substantial risk that he will not be adequately compensated. The Rule which permits reimbursement when the trustee is successful and denies reimbursement where he is unsuccessful seems to be a fair one and consistent with the general policy to be served. This is a doubtful case, and the Court has resolved the doubt in favor of the general policy. There is no doubt that the Trustees were entitled to some compensation, and, looking at the matter broadly, the only question was how much. In the face of the position taken by some of the beneficiaries that they were entitled to no compensation at all, the Trustees cannot be criticized, nor should they be penalized, for claiming that compensation which the statute provides shall be paid in the usual case."

*The Decision*

The beneficiaries in their cross-appeal present the issue for decision in terms of counsel fees sought by the trustees for services and expenses "incurred in connection with an unsuccessful claim against the trust assets for a termination commission based on the value of the corpus of the trust." Any doubt as to what is being attacked on cross-appeal was removed by the beneficiaries' explanation in their reply brief that the beneficiaries "restricted their cross-appeal to the portion of the order allowing counsel fees to the extent that they were incurred to press the unsuccessful claim for a termination commission on corpus." Thus it is clear that they are not challenging that portion of the counsel fees which were incurred to press the successful claim for commissions on income received.[20]

Arguing the issue in their brief, the beneficiaries urge that the allowance for counsel fees with respect to a termination must fall for two reasons:

> "First, the trustees' claim for a termination commission was neither necessary for the proper administration of the trust nor was it made for the benefit of the trust estate.[21] . . .
>
> Second, the trustees were *not* successful in obtaining the terminating commission."

The reasons necessarily imply two rules of law: (1) that counsel fees chargeable to the trust are to be allowed to a conventional trustee only when the counsel's services were reasonably necessary for the proper administration or management of the trust,[22] and (2) even if counsel's services

---

**20.** This is in accord with what we are told about the proceedings below. According to the chancellor, as we have indicated, the argument made at the hearing on the allowance of counsel fees "was that, at best, the trustees had been partially successful in their claim for commissions, and the suggestion was that they should be allowed only a proportionate part of the total counsel fees."

**21.** The beneficiaries add: "It did not grow out of any provision of the instrument. It was made purely for the personal benefit of Messrs. Sokol and Eliasberg."

**22.** The general rule is that "when a trustee finds it necessary to employ or advise with counsel as to the proper management of the trust estate, he will be allowed, under the head of just allowances, such reasonable fees as

to a trustee with respect to obtaining compensation for that trustee are reasonably necessary to the proper administration or management of the trust when successful they are not so necessary when unsuccessful.

The trouble with the beneficiaries' position is that even if their reasons are entirely sound they cannot prevail. If we accept, *arguendo*, their claim, now made, that "it is no more proper to pay counsel fees from the trust when a trustee's commissions claim is allowed than when it is denied", or in other words, if we assume the validity of the legal basis of the beneficiaries' two reasons why the counsel fee with respect to the unsuccessful termination commissions should not be allowed, we must, in order to give the relief requested, apportion the $8,686.32 between the services rendered in connection with the successful claim and the unsuccessful claim for compensation for the trustees. This we are not able to do.

> "The decision of the court is presumptively correct, because of its opportunity to know or ascertain and estimate aright the value of the services, but its finding is subject to review on appeal, and will be reversed for clear and substantial error." *County Corporation v. Semmes*, 169 Md. 501, 527. See cases cited therein. Quoted and applied in *Spencer v. McMullen, supra*, at 98.

Because of the state of the record before us, there is no basis for us to determine whether the chancellor erred in concluding that it was impossible "to accurately separate the work which pertained solely to the commission granted from the work which pertained to the commission which was denied," and in finding "little or no justification for making

---

he may have paid in properly taking the opinion and procuring the direction and assistance of counsel." Miller, *supra*, § 562, pp. 663-664. See Sollers v. Mercantile Safe Deposit and Trust Company, 262 Md. 606; Spencer v. McMullen, 198 Md. 90; Cook v. Boehl, 188 Md. 581; Horwitz v. Safe Deposit and Trust Company, 172 Md. 437; Amer. Colonization Society's Case, 132 Md. 524; Taylor v. Denny, 118 Md. 124; Griffith v. Dale, 109 Md. 700; Title Co. v. Burdette, 104 Md. 666; Renee Bauziere Saulsbury v. The Denton National Bank, 25 Md. App. 669; 3 Scott, Law of Trusts § 188.4 (3rd ed. 1967).

an arbitrary decision." The beneficiaries allege in their brief: "The Chancellor did not permit counsel for the beneficiaries to cross-examine counsel for the trustees, nor did the Chancellor require counsel for the trustees to apportion their fee services rendered in connection with the termination commission and services in connection with the income commission claims, despite the request of counsel for the beneficiaries that they be required to do so." From the record, there is no way we can review the propriety of these rulings of the chancellor. Sokol and Eliasberg suggest that the beneficiaries "failed to preserve an adequate record for this court to substitute its judgment for the finding of the trial court that the legal services provided to the trustees on the compensation issue could not be accurately divided between services related to the question of commissions on income and the question of the statutory termination commission on corpus." Of course, it is not our function to substitute our judgment on the evidence for that of the trial court, but the trustees are correct in what they say to the extent that, on the state of the record, which was the obligation of the beneficiaries as to matters on their cross-appeal, there is no way for us to determine whether the chancellor was clearly erroneous in his judgment. It follows, therefore, that we must assume that the chancellor was correct in his finding that the allowance for counsel fees cannot be apportioned. Because it cannot be apportioned, that part of the allowance which the beneficiaries do not challenge cannot be separated from that part which they attack. In that posture we cannot say that there was clear and substantial error in the allowance of the fee in the amount of $8,686.32. That part of the order allowing it is affirmed.

> *Order of 5 July 1974 affirmed; costs to be paid one-half by appellants-cross appellees and one-half by appellees-cross appellants.*