PETER H. MADDEN ET AL. *v.* MERCANTILE-SAFE
DEPOSIT AND TRUST COMPANY,
TRUSTEE, ET AL.

[No. 803, September Term, 1974.]

*Decided June 12, 1975.*

18

The cause was argued before MORTON, POWERS and GILBERT, JJ.

Peter H. Madden in proper person. *Clarke Murphy, Jr.,* and *Peter Parker* for other appellants.

*H. Vernon Eney* and *J. Cookman Boyd, Jr.,* with whom were *Lee M. Miller, Judith A. Armold, Nell B. Strachan* and *Venable, Baetjer & Howard* on the brief, for appellee Mercantile-Safe Deposit and Trust Company. *Rignal W. Baldwin, Thomas Waxter, Jr.,* and *A. MacDonough Plant,* with whom were *Semmes, Bowen & Semmes* on the brief, for other appellees.

POWERS, J., delivered the opinion of the Court.

This case involves the Pimlico Race Track and the law of trusts. A prologue to the litigation now before us could, in the right hands, make a thoroughly enchanting historical novel. The present case, and other litigation which arose as the Hammond Trust approached or arrived at its termination, could furnish the material for a fascinating documentary.

Because it is beyond our competence to achieve either of those results, as well as inappropriate that we attempt to do so, we shall relate, in unembellished form, only so much of the history and of the facts involved as are material and necessary to an understanding of the legal questions we must decide.

## Background for the Present Case

William R. Hammond became the owner, in 1905, of some 78 acres of land, with improvements, known as Pimlico Race Track, then located in Baltimore County but which, by later annexation, became a part of the City of Baltimore. The entire property was leased to The Maryland Jockey Club of Baltimore City, which conducted horse racing there. Mr. Hammond, then a widower, died in 1909. His will left the Pimlico property and other assets to Safe Deposit and Trust Company of Baltimore, now Mercantile-Safe Deposit and

Trust Company,[1] in trust, and provided, with minor exceptions not now material, that the income be paid to his only child, a daughter, Audrey F. Hammond, for her life. The daughter later became Mrs. Audrey Hammond Madden. In his will the testator gave his daughter a power of appointment, and provided that if she did not exercise the power, the principal of the trust would, at her death, go to the persons who would be entitled to it as if he had died intestate.

Through successive leases negotiated between them from time to time, the Pimlico property held by Mercantile, enlarged by the later acquisition of certain contiguous parcels, was continuously leased to the Jockey Club, until August 1947. Under an agreement of sale dated 30 April 1947, the Trustee sold the Pimlico property which it held to the Jockey Club for $1,115,000. Settlement of that sale in August 1947 terminated the lease which, by its terms, would have ended in 1949.

Mrs. Madden, in 1943, irrevocably released the power of appointment she had under her father's will. The legal effect of that release was determined by the Court of Appeals in *Madden v. Mercantile-Safe Deposit and Trust Co.*, 262 Md. 406, 278 A. 2d 55 (1971). Her release of the power of appointment, thus rendering impossible a divestiture of the remainder, which she could have accomplished by an exercise of the power, did not, as she contended, merge the remainder with her life estate, on the ground that she was the sole person who would have been entitled to take if Mr. Hammond had died intestate. On the contrary, said the Court of Appeals, the class of persons entitled to the remainder was to be determined at the time of Mrs. Madden's death, and would be those persons who then would have been entitled, according to the law in effect in 1909, to take Mr. Hammond's estate had he died intestate.

To continue this narrative, we quote from the opinion in *Madden v. Cosden*, 271 Md. 118, 314 A. 2d 128 (1974), an

---

1. We shall refer to the trustee throughout as "Mercantile", although that part of the name was acquired by merger in 1953.

earlier appeal from an order entered in the present case, where the Court of Appeals said, at 119-20:

"Mrs. Madden died on 4 January 1972, survived by three daughters, Audrey Cosden, Anne M. Hallenbeck, and Jane M. Humphreys, each of whom have descendents, and by three grandchildren, Peter H. Madden, Michael J. Madden and Christina Little Madden, the children of Mrs. Madden's only son, James H. Madden, who had died in 1953.

"Immediately following Mrs. Madden's death, Mercantile-Safe Deposit and Trust Company (the Mercantile), trustee of the trust estate created by Mr. Hammond's will, caused to be prepared a schedule of the assets then comprising the trust, which had a value of some $3,000,000.00, and of a proposed distribution, under which Mrs. Cosden, Mrs. Hallenbeck and Mrs. Humphreys, daughters of Mrs. Madden and granddaughters of Mr. Hammond, would each receive one-fourth of the trust assets, and Peter H. Madden, Michael J. Madden and Christina Little Madden, grand-children of Mrs. Madden and great-grandchildren of Mr. Hammond, would each receive one-twelfth of the trust assets, since they shared equally the one-fourth share which would have passed to their father, if living.

"When it became apparent that all of the children of James H. Madden were not willing to acquiesce in the proposed distribution, the Mercantile in June, 1972, filed in the Circuit Court of Baltimore City a bill of complaint which recited the circumstances; asked that the court assume jurisdiction of the trust, and determine the proper distribution of the trust estate.

"All of the parties defendant answered. Mrs. Cosden, Mrs. Hallenbeck and Mrs. Humphreys accepted the proposed distribution. Michael J. Madden and Christina Madden submitted to the jurisdiction of the court. Peter H. Madden later

filed an amended answer and cross-claim in which he asserted, *inter alia*, that he was entitled to one-sixth of the trust assets, on the theory that the trust estate was equally distributable between Mrs. Cosden, on the one hand, and the three children of James H. Madden, on the other.

"The filing of the answer and cross-claim spawned a flurry of pleading, pre-trial discovery and depositions, little of which is pertinent here. Ultimately, the issue raised by Peter H. Madden's cross-claim as regards the distribution of the corpus of the trust came on for separate trial. From a decree ordering distribution in the manner proposed by the Mercantile, Madden appealed."

The issue presented and decided in *Madden v. Cosden, supra*, was the validity of Mrs. Madden's second marriage, following a Nevada divorce, and whether Mrs. Hallenbeck and Mrs. Humphreys, children of that second marriage, were entitled, as lawful heirs and next of kin of Mr. Hammond, to share in the distribution. The Court of Appeals held that they were.

### The Present Case in the Circuit Court

Mercantile's bill of complaint to determine the proper distribution of the trust was filed in the Circuit Court of Baltimore City on 23 June 1972. Combined answers, cross-claims, and counterclaims filed by Peter H. Madden on 21 August and 23 August were later stricken, apparently for reasons of form, and on 26 December 1972, with leave of court, he filed an amended counterclaim, naming as counter-defendants Mercantile, in its trust capacity and in its individual capacity, and, as an added party, the Jockey Club. Leave to bring in the Jockey Club as a counter-defendant was later granted. At the same time he filed his answer to Mercantile's complaint Peter H. Madden filed the cross-claim against his codefendants which raised the issue decided in *Madden v. Cosden, supra*.

On 10 April 1973, with leave of court, Peter H. Madden filed a second amended counterclaim, in which Audrey

Cosden joined. On 17 May 1973, with leave of court, a third amended counterclaim, in which Michael Madden and Christina Madden also joined as counter-complainants, was filed.

The counterclaim alleged that in selling the Pimlico Race Track to the Jockey Club in 1947, Mercantile had breached its fiduciary duty in numerous ways, resulting in the disposition of a trust asset for an inadequate price. It sought to surcharge Mercantile for the difference between the sale price and the actual value, or, in the alternative, to rescind the sale.

Trial on the merits of the issues raised by the third amended counterclaim and the pleadings responsive to it was held before Judge David Ross beginning 4 June 1973. Evidence on behalf of the counter-complainants was concluded on 21 June 1973. Several motions then made or pending were argued. On 27 June 1973 Judge Ross rendered an oral opinion ruling on several motions, and reserving his ruling on one of the motions until after receipt of requested memoranda from counsel. The all-important ruling made at that time was the granting of motions of the counter-defendants to dismiss the third amended counter-claim on the ground that the evidence was not legally sufficient to entitle the counter-complainants to recover.

Other rulings had been made from time to time on interlocutory matters before the trial on the merits. Other questions arose and were ruled upon during the post trial period. A final decree was signed by Judge Ross and filed on 23 May 1974. An order for appeal filed timely thereafter by Peter H. Madden, separately, noted his appeal from an order entered on 13 February 1973, from an order of satisfaction between the four counter-complainants and the Jockey Club, approved by the court and filed on 29 October 1973, and from the final decree of 23 May 1974. An order for appeal on behalf of Audrey Cosden, Michael Madden, and Christina Madden noted their appeal from the order entered on 13 February 1973 [2] and from the final decree of 23 May 1974.

---

2. The order of 13 February 1973 authorized inspection of Mercantile's

## The Issues in this Appeal

In this Court the appeals were separately briefed and argued by appellant Peter H. Madden on the one hand, and on behalf of appellants Audrey Cosden, Michael Madden, and Christina Madden, on the other hand. Questions presented by Peter H. Madden in his brief are these:

### I The Sale of Pimlico

"Whether it was improper for the Trustee to have sold Pimlico Race Track for substantially less than the value of the fiduciary asset and whether the Trustee should have its commissions disallowed and should be surcharged for the inadequacy in price, consequential damages and interest."

### II Special Fee To See The Trust Records

"Whether the Trustee has a right to charge the beneficiaries a special fee in excess of statutory commissions for the salary of its employee whom it assigned to oversee the inspection of the trust records."

### III Mercantile-Safe's Claim for Double Attorneys' Fees

"Whether the Trustee has any right to reimbursement for its attorneys' fees and disbursements."

"If reimbursement is awarded, whether the Trustee may properly have reimbursement for the attorneys' fees and disbursements of two law firms, in one case, employed by it as Trustee, and in the other case, employed by it in its individual corporate capacity."

Another contention of Peter H. Madden involves the effect of the mutual post-trial order of satisfaction of all claims

---

trust records, and directed that the cost of monitoring the inspection be prorated among the parties participating.

between the four counter-complainants and the Jockey Club. Before the final decree he moved to amend or correct that order, fearing that it may be subject to a construction which would be contrary to the intent of the parties. His motion was heard and denied after the final decree. He noted an appeal from the order denying that motion.

In their brief and in their argument here, the other appellants present in three different aspects the contention that Mercantile, in the sale of the Pimlico Race Track, breached its duty as a fiduciary, and should be surcharged for the difference between the sale price and the actual value of the trust asset. They raise the additional question of whether Mercantile had the right to pay itself a percentage of the sale price as a commission, without an appropriate order of court.

Appellant Peter H. Madden, tangentially if not directly, and the other appellants directly, argue that the chancellor erred in granting a motion to strike the evidence of two witnesses who testified for the counter-complainants on the question of value.

Somewhat related to two of the subsidiary questions in this appeal, yet standing on its own, is the position of Jane M. Humphreys and Anne M. Hallenbeck, the two younger daughters of Audrey H. Madden. They appear here as appellees. They were named as defendants in the original bill of complaint. They consented to the distribution proposed by Mercantile. They filed in the case on 1 June 1973 a statement of position, saying that they did not wish to become parties to the counterclaim, nor enter that portion of the case in any manner, and disclaiming, renouncing, and releasing Mercantile and the Jockey Club from any claims made by the counter-complainants. Their only concern here is that there be no change in the chancellor's order that the reasonable expenses of Mercantile, including counsel fees, be charged, not against the entire trust estate, but only against the distributive shares of the counter-complainants.

## The Motion To Dismiss

We shall proceed directly to a consideration of the major

question in the case — the correctness of the chancellor's order granting the motion of Mercantile to dismiss the counter-complaint.

Maryland Rule 535 says:

> "In any action tried by the court without a jury at law or in equity, any party, without waiving his right to offer evidence in the event the motion is not granted, may move at the close of the evidence offered by an opponent for a dismissal on the ground that upon the facts and the law he has shown no right to relief. Unless the court otherwise specifies, such a dismissal operates as an adjudication upon the merits."

It was this Rule which Mercantile invoked when, at the close of the evidence offered by the counter-complainants, it moved for a dismissal. The motion tested the legal sufficiency of the evidence.

In *Allen v. Steinberg,* 244 Md. 119, 223 A. 2d 240 (1966), Chief Judge Hammond said for the Court of Appeals, at 123:

> "We think that in deciding whether to dismiss an equity action at the close of the complainant's case, the chancellor under Rule 535 must view the evidence, that is, draw the legitimate inferences most favorably to the complainant * * * ."

In that case the Court reviewed the evidence and concluded that it made out a prima facie case. It remanded "for the taking of the testimony of the appellees to rebut if they can the prima facie case made out by appellant."

In *Price v. Levin,* 248 Md. 158, 235 A. 2d 547 (1967), Price had sought to enjoin, as in violation of zoning regulations, a use by Levin of his property. The chancellor had granted Levin's motion to dismiss. Saying that Price was entitled to have the chancellor consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to him, the Court recited some of the facts which emerged from the evidence. It said, at 162:

> "Price's case has other facets which, in the final

analysis, may or may not advance his cause but, at this stage of the proceedings, it is not necessary for us to dwell upon them since we think the evidence above set forth makes out a prima facie case that Levin was in violation of the regulations. The chancellor should have denied his motion to dismiss."

The Court reversed the order and remanded the case for further proceedings.

After a lengthy review of the evidence before the chancellor in *Shoreham v. Randolph Hills*, 248 Md. 267, 235 A. 2d 735 (1967), the Court of Appeals said, at 278:

"It must be borne in mind that the Chancellor dismissed the bill of complaint at the close of the appellants' case pursuant to Maryland Rule 535, and under such circumstances the testimony and evidence adduced by the appellants stand undisputed and they are entitled to every favorable inference which may reasonably be drawn from their testimony and exhibits. We think the Chancellor was in error in dismissing the case, and accordingly we reverse the order granting the motion to dismiss and remand the matter for further proceedings."

To the same effect in their application of Rule 535 are *Isen v. Phoenix Assurance Co.*, 259 Md. 564, 270 A. 2d 476 (1970); *Styers v. Dickey*, 261 Md. 225, 274 A. 2d 374 (1971); *Davis Advisory Services v. Executive Staffing*, 264 Md. 644, 288 A. 2d 148 (1972); *Presutti v. Presutti*, 270 Md. 193, 310 A. 2d 791 (1973); and *Snider Bros., Inc. v. Heft*, 271 Md. 409, 317 A. 2d 848 (1974). In *Davis Advisory Services v. Executive Staffing, supra*, the Court of Appeals said, at 645:

"In order for the trial judge to have correctly granted this motion it would have been necessary for him to consider appellant's evidence, including all logical and reasonable inferences which can be drawn therefrom, in a light most favorable to Davis

and then properly determine that a prima facie case
had not been established."

We have reviewed the evidence which was before the
chancellor in the present case. Before we could reach a
conclusion it was necessary that we establish precisely what
was the ultimate issue upon which the ruling must turn,
what subordinate issues there were to be determined as
requisites to the determination of the ultimate issue, what
the applicable law required as a showing sufficient to
establish each issue, or to raise, as to each issue, a conflict
which called for the use of the judicial fact finding process.

Adequacy of the selling price of the trust asset is the
single contention of the appellants around which everything
else revolves. It is the ultimate issue in this case. Inadequacy
may in some cases be established by direct evidence, and
generally must be accompanied by a showing of lack of
diligence, failure to exercise judgment, lack of good faith, or
the existence of such conflicting interests, real or potential,
as to raise doubts of the ability of the trustee to live up to
the duty of loyalty he owes to the beneficiaries.

In II Scott, *Law of Trusts*, § 170 (3d ed. 1967) the author
says:

> "The most fundamental duty owed by the trustee
> to the beneficiaries of the trust is the duty of
> loyalty. This duty is imposed upon the trustee not
> because of any provision in the terms of the trust
> but because of the relationship which arises from
> the creation of the trust. A trustee is in a fiduciary
> relation to the beneficiaries of the trust. There are
> other fiduciaries such as guardians, executors or
> administrators, receivers, agents, attorneys,
> corporate directors or officers, partners, and joint
> adventurers. In some relations the fiduciary
> element is more intense than in others; it is
> peculiarly intense in the case of a trust. It is the
> duty of a trustee to administer the trust solely in
> the interest of the beneficiaries. He is not permitted
> to place himself in a position where it would be for

his own benefit to violate his duty to the beneficiaries."

The responsibilities of a trustee in selling a trust asset were discussed by the Court of Appeals in *Kramme v. Mewshaw*, 147 Md. 535, 128 A. 468 (1925). Suit was brought by a beneficiary in the remainder asking the court to assume jurisdiction over a testamentary trust, and to set aside a sale of a farm made by the trustee. The Court of Appeals reversed the lower court's action, after a full trial on the merits, in setting aside the sale. The Court noted, at 541:

"There is no question that the trustees had the power, and that it was sound judgment, to sell the farm. Whether jurisdiction should be assumed and the sale upset turns on (1) the method of making the sale and (2) the inadequacy of the purchase price."

After reviewing pertinent facts the Court said, at 545:

"During these unhurried negotiations between the purchaser and the trustees, the court has not found anything but the usual matching of wit against wit in the effort of the vendors to sell as high, and the vendee to buy as cheap, as possible. Nothing occurred in the course of the transaction on which to base a charge that the sale was induced by fraud, deceit, misrepresentation, or other wrongdoing by the buyer, or was the result of any material dereliction of duty on the part of the trustees, who acted throughout honestly and in good faith."

Here we think it is helpful to quote somewhat extensively from the opinion written by Chief Judge Brune for the Court of Appeals in *Webb & Knapp v. Hanover Bank*, 214 Md. 230, 133 A. 2d 450 (1957), in which the Court affirmed the action of the chancellor below in refusing, after a full trial on the merits, to ratify a sale of a trust asset made by a conventional trustee, and ordering that the property be resold. The Court said, at 243-44:

"In speaking of the duties of a conventional trustee, as distinguished from a judicial trustee, this Court said in *Kramme v. Mewshaw, supra*, (at 147 Md. at 548) 128 A. at 473: 'A conventional trustee, * * * who is proceeding without the assumption of jurisdiction by the court, is not affected by the regulations of the mode of sale in chancery, but he is bound, in the effort to secure the fair market value of the property, to employ that degree of care which a reasonably prudent man would exhibit in the conduct of a similar sale. *Miller's Equity*, secs. 493, 495, 488. If a sale should be made by a conventional trustee in good faith and according to his best judgment, the sale will not be set aside unless there exists an inadequacy of price that, under the circumstances, is directly attributable to some failure of reasonable diligence or effort in the making of the sale.'

"Later in the same case the Court said (147 Md. at 550-551): 'While a private sale, without public advertisement, does not require the same degree of inadequacy of price and of a reasonable expectation that a re-sale will produce a better result as are necessary to defeat a sale by public auction, yet both an inadequacy of price and a justifiable expectation of securing a higher price must co-exist before a court will set aside a contract of private sale made in good faith by a conventional trustee in the exercise of a discretion which was incident to an express power of sale. *Weinstein v. Boyd*, 136 Md. 227, 234; *Baer v. Kahn*, 131 Md. 17, 26, 27 * * * .'

"*Kramme v. Mewshaw* is cited with approval in *Knight v. Nottingham Farms, Inc.*, [207 Md. 65, 113 A. 2d 382 (1955)].

"Fiduciaries undertaking to exercise powers of sale must, of course, make proper efforts to learn the value of what they propose to offer for sale. *Park & Tilford Import Corp. v. Nash*, 166 Md. 373, 171 A. 339.

> "Mere inadequacy of price alone will ordinarily not warrant setting aside a sale. *Boyd v. Smith*, 127 Md. 359, 96 A. 526, and cases therein cited. See also *Shirk v. Soper*, 144 Md. 269, 124 A. 911.
>
> "Nor will the mere fact that someone else is later willing to pay more for the property by itself cause a sale to be set aside. *Blank v. Frey*, 165 Md. 647, 170 A. 156; *Cook v. Safe Deposit & Trust Co.*, 172 Md. 398, 191 A. 713; *Gilden v. Harris*, 197 Md. 32, at 42, 78 A. 2d 167."

In the case before us the contentions of the appellants cover the full range of breach of fiduciary duty, from bad faith and self dealing, to precipitous action, lacking the required diligence, and taken by the exercise of poor and uninformed judgment and without exploiting potential offers to buy at a higher price.

In a case attacking the sale of real estate by a testamentary trustee, *Lopez v. Lopez*, 250 Md. 491, 243 A. 2d 588 (1968), Judge Singley for the Court of Appeals discussed the contention of the appellants-beneficiaries regarding the burden on Helen Lopez, the trustee, and said, at 501-02:

> "Helen's position, as stated in her brief, is that the beneficiaries, who were the plaintiffs below in the case attacking Helen's administration of the trust, have the burden of proving that they are entitled to relief; that if 'doubts and obscurities' were raised by the beneficiaries, they were resolved by testimony offered by or in behalf of Helen; and that a consideration of each of the challenged transactions will bear this out. Helen's position is well taken.
>
> > 'A beneficiary seeking to obtain relief for a breach of trust must plead and prove facts which show the existence of a trust duty, the failure of the trustee to perform it and that consequently the court should grant the requested remedy. * * * If the cestui shows a

prima facie case, the burden of contradicting it or showing a defense will shift to the trustee.' Bogert, *Trusts and Trustees* (2d Ed. 1962) § 871 at 89-90.

Putting this another way, the person who challenges the conduct of a trustee, must first allege that the trustee has a duty and has been derelict in the performance of this duty, and offer evidence in support of this allegation. Then, and not until then, does the trustee have the burden of rebutting the allegation. In the absence of such proof, there is no duty on the trustee to prove a negative: *i.e.*, that he has not been derelict in the performance of his duties.

"We think that the beneficiaries' reliance on 'doubts and obscurities' as a reason for shifting the burden of proof is misplaced. This is a concept peculiarly applicable to trust accounting. *Berlage v. Boyd*, 206 Md. 521, 532, 112 A. 2d 461 (1955); *Hatton v. Weems*, 12 G. & J. 83, 109 (1841); *Bogert, supra*, § 962 at 11, and there is no doubt that a trustee who fails to keep proper accounts has the burden of proving entitlement to the credits he claims. *Restatement (Second), Trusts* (1959) § 172, comment b at 377; *Berlage v. Boyd, supra.* Here the principal thrust is against Helen's transactions."

We lay aside "self dealing" in the strict sense. Appellants misuse the term, we think, in characterizing Mercantile's actions. When a person, natural or corporate, is a party to or otherwise profits from a transaction with a trust or other estate of which he is a fiduciary, as when he buys from or sells to the trust, or acts as a broker in the sale, he is self dealing. The courts generally hold that such a transaction, in the absence of full disclosure and consent of all beneficiaries, is voidable by the beneficiaries, with no need to show unfairness. *McDaniel v. Hughes*, 206 Md. 206, 111 A. 2d 204 (1955); *Schockett v. Tublin*, 170 Md. 117, 183 A. 521 (1936); *Mangels v. Tippett*, 167 Md. 290, 173 A. 191 (1934).

Mercantile did not buy the Pimlico Race Track property from the Hammond Trust, nor otherwise profit from the sale, except for its commissions as trustee. The sale did not involve any self dealing.

Appellants point to evidence that several members of the Board of Directors of Mercantile had other connections which, appellants contend, showed or raised a presumption that each was subject to conflicting interests which destroyed or impaired his ability to act in the best interest of the Hammond Trust.

Charles E. Rieman was the president of Western National Bank, which was the Jockey Club's principal depository, and which at times made substantial loans to the Jockey Club.

F. Granger Marburg was a partner in the brokerage firm of Alex. Brown & Sons, and as such was a partner of W. Wallace Lanahan. Mr. Lanahan was a member of the board and executive committee of the Jockey Club, and was one of the Jockey Club's two negotiators for the purchase of the Pimlico Race Track. There was also evidence to indicate that Alex. Brown & Sons owned 350 shares of stock of the Jockey Club, but there was further evidence that the stock had been acquired for Alfred Gwynn Vanderbilt and had been transferred to him.

Edwin F. A. Morgan was a partner in the law firm of Semmes, Bowen and Semmes, and as such was a partner of Lawrence Perin, and shared with him in the fees received by the law firm for its representation of the Jockey Club. Mr. Perin was a member of the board and executive committee of the Jockey Club, and was the Jockey Club's other negotiator for the purchase of the Pimlico Race Track.

J. Edward Johnston personally owned 100 shares of stock of the Jockey Club.

Messrs. Rieman, Marburg, Morgan, and Johnston were members of Mercantile's board of directors. Messrs. Rieman and Johnston were members and Messrs. Marburg and Morgan were associate members of the executive and of the trust investment committees.

There was evidence that Mercantile held, in various trusts

or in agency accounts, some 950 shares of stock of the Jockey Club. Mr. Vanderbilt owned a majority of the Jockey Club's 4,540 outstanding shares.

The evidence showed that in 1946 a question which had become of significant importance was the adequacy of the physical facilities at Pimlico, and the feasibility of improving them, or of moving to a different location. The then current lease would have expired in 1949. The Jockey Club suggested that it would purchase the property from Mercantile, and suggested a price of $700,000.00. Mercantile informed Mrs. Madden, the life beneficiary, who was then thought by some to be the sole party in interest, because of her renunciation of the power of appointment in her father's will. Her personal attorney was also kept informed. She declined to consider the offer of $700,000.00.

Later in 1946 Mercantile arranged to have a Mr. Gilbert, a well known real estate appraiser in Baltimore, appraise the land. He valued it at $540,000.00. A Philadelphia engineering firm, suggested by Mrs. Madden's attorney, made a study primarily to determine what it would cost the Jockey Club to relocate its racing operation, and to duplicate Pimlico's physical facilities at a new location. One of the conclusions of that study was that the improvements at Pimlico could be reproduced new at a cost of approximately $1,600,000.00, and that their current depreciated value was $1,000,000.00. Mercantile noted that the value of the Pimlico property, at least by one approach, was indicated to be $1,540,000.00.

Mercantile also approached the question of value in other ways. It made studies by capitalizing rents, adjusted for what it considered to be valid factors, using several different assumed rates of return. Possible values ranged up to a figure in excess of $2,000,000.00. There was other evidence at the trial indicating even higher values. Mercantile concluded that $1,500,000.00 was a reasonable value. It put that figure to the Jockey Club as an asking price.

Other factors affecting value which were shown by the evidence were that the Jockey Club, not the trust, owned the names of several well known stakes races run at Pimlico,

most famous of which was the Preakness. The Jockey Club, not the trust, was the licensee for conducting horse racing at Pimlico. State laws then in effect froze major racing at mile tracks in Maryland at the existing four locations, so that each party was, in many ways, compelled to deal only with the other.

The General Assembly session of 1947 saw indications of change. A bill was introduced which would authorize any of the four major licensees to conduct racing at a different location, but which would still limit the number of licensees to four. The parties met as adversaries in the lobbies and halls of the State House. Intensive lobbying activities were conducted on behalf of each. As the session was nearing its end, the lobbyists for Mercantile were successful in bringing about an amendment to the bill which would permit a licensee to relocate, but would then permit racing at five locations. The amendment was passed by the Senate on second reading by a vote of 15 to 13.

It was clear that if that amendment became a part of the law, the owner of Pimlico Race Track would have to deal with a tenant which had alternatives. The Jockey Club could stay, under a new lease, or it could relocate. If it relocated, the trust would be required to seek another operator, one which could obtain a license, and which could then conduct horse racing at Pimlico. Pimlico would then be one of five, rather than four, major tracks in Maryland. If the amendment failed of final passage, the owner of Pimlico would have little more than a piece of real estate, appraised at slightly over one half of a million dollars.

Before the Senate Bill came up for third reading, a memorandum of agreement was reached by negotiators for the Jockey Club and Mercantile. The Jockey Club would buy the property for $1,115,000.00.

There was evidence that Mercantile did little or nothing to find or interest other possible purchasers. There was evidence that it did little or nothing to exploit indications of interest from other sources.

In *Cumberland Coal and Iron Co. v. Parish,* 42 Md. 598

(1875), Judge Alvey, speaking for the Court of Appeals, said, at 604-07:

> "It appears that at the time when the mortgage sought to be enforced was made, and for some time previous, Sherman, the mortgagee, was not only one of the directors, but was a member of the executive committee; and also financial agent of the company, the mortgagor. There is therefore no question as to the fact that Sherman bore an important fiduciary relation to the company, as well as one of trust and confidence in the general control and management of its affairs. Holding such relation, he was bound to exercise all the power and authority delegated to him, in conjunction with others, for the protection of the property, and the promotion of the best interest of the corporators, the stockholders, according to his skill and ability. As between trustee and *cestui que trust*, or agent and principal, the rule is inflexible, that the trustee or agent cannot be allowed to take the benefit of a transaction the entering into which was in violation of his duty, or where the benefit claimed and the duty required to be performed are in any respect inconsistent, the one with the other. The rule is founded on considerations of public policy, having in view the great difficulty, which must always exist in such cases, of obtaining clear and satisfactory evidence of the fairness of the transaction, and of the entire absence of all abuse or advantage taken of the confidence reposed in such trustee or agent. And it is now well settled that directors and managers of corporations, and other companies, are equally within the rule which guards and restrains the dealings and transactions between trustee and *cestui que trust*, and agent and his principal; such directors or managers being in fact trustees and agents of the bodies represented by them. *Att'y Gen. v. Wilson*, 1 Cr. & Phil. 1;

*Benson v. Heathorn,* 1 Y. & Coll. 326; *R. R. Co. v. Hudson,* 16 Beav. 485; *R. R. Co. v. Blaikie,* 1 Macq. 461; *R. R. Co. v. Magnay,* 25 Beav. 587; *Hoffman Coal Co. v. Cumb. C. & I. Co.,* 16 Md. 456, and *Same Case,* in 20 Md. 117.

"The affairs of corporations are generally intrusted to the exclusive management and control of the board of directors; and there is an inherent obligation, implied in the acceptance of such trust, not only that they will use their best efforts to promote the interest of the shareholders, but that they will in no manner use their positions to advance their own individual interest as distinguished from that of the corporation, or acquire interests that may conflict with the fair and proper discharge of their duty. The corporation is entitled to the supervision of all the directors, in respect to all the transactions in which it may be concerned; and if one of the directors is allowed to place himself in the position of having his conduct and accounts made the subject of supervision and scrutiny, he, of course, cannot act, in regard to those matters, both for himself and the corporation; and the consequence is, that the corporation is deprived of the benefit of his judgment and supervision in regard to matters in which such judgment and supervision might be most essential to its interest and protection. Not only this, the remaining directors are placed in the embarrassing and invidious position of having to pass upon, scrutinize and check the transactions and accounts of one of their own body, with whom they are associated on terms of equality in the general management of all the affairs of the corporation. The design of the rule, therefore, is to secure a faithful discharge of duty, and, at the same time, to close the door, as far as possible, against all temptation to do wrong, by subjecting the transactions between parties standing in such

confidential relations, to the most exact and rigid scrutiny, whenever such transactions are brought in question before the courts.

"The transaction may not be *ipso facto* void, but it is not necessary to establish that there has been actual fraud or imposition practiced by the party holding the confidential or fiduciary relation; — the *onus* of proof being upon him to establish the perfect fairness, adequacy, and equity of the transaction; and that too by proof entirely independent of the instrument under which he may claim. This is required, upon the general principle, 'that he who bargains in a matter of advantage with a person, placing confidence in him, is bound to show that a reasonable use has been made of that confidence; a rule applying equally to all persons standing in confidential relations with each other. If no such proof is established, Courts of Equity treat the case as one of constructive fraud.' 1 Story's Eq. sec. 311, 321, 322; *Pairo v. Vickery,* 37 Md. 467."

The Court of Appeals in *Hammond v. Lyon Realty Co.,* 163 Md. 442, 163 A. 480 (1932), entered its judgment in a majority per curiam order. In a separate plurality opinion Judge Parke, after citing and quoting from *Cumberland Coal and Iron Co. v. Parish, supra,* said, at 469-70:

"The principle adopted by our predecessors has merits which should prevent any departure, since it serves, not only to check the cupidity of corporate fiduciaries and to remove the difficulty of obtaining evidence of wrongful conduct by declaring presumptively fraudulent the questioned transactions, but also to assure protection and permanency to just corporate transactions by making this presumption rebuttable, upon the production by the fiduciaries of proof which clearly establishes that the transactions are fair, honest, and equitable.

"The more drastic doctrine enforced in other jurisdictions has, apparently, not been more effective than that of this tribunal in the prevention of breaches of duty by the fiduciaries of corporations; and is furthermore open to the practical objection that its tendency is to deprive the corporation of the aid, in its financial affairs, of those best advised of the necessity for the aid and most interested in giving it, with judgment, according to the exigencies of the situation."

In the case now before us there was evidence at the trial which, viewed most favorably to the counter-complainants, coupled with reasonable inferences from the evidence, could have permitted a trier of fact to find the fair value of the asset sold to be within a wide range of indicated values. There was evidence from which a trier of fact could find that Mercantile used due diligence and exercised good judgment under all the circumstances, but the evidence would likewise permit finding that Mercantile failed to use the required diligence and good judgment in selling the trust asset. There was evidence of potential for conflicts of interest, from which a trier of fact might infer that conflicts did, or might infer that they did not, result in a less than adequate price by affecting the quality of diligence and judgment with which the sale was made.

A ground argued below by Mercantile in support of its motion to dismiss was that whatever rights the counter-complainants may have had could not now be asserted, because of laches. The chancellor did not find it necessary to decide the point.

We point out first that any laches which could have been chargeable to Mrs. Audrey Madden, the life beneficiary, cannot be charged to the counter-complainants. In *Zimmerman v. Fraley*, 70 Md. 561, 17 A. 560 (1889), the Court of Appeals said, at 571:

"It is unnecessary to advert to the testimony bearing upon the alleged acquiescence of Mary A.

Fraley, the *cestui que trust* for life, because no mere acts of hers, however clearly established, could be binding on the persons entitled to the remainder."

There were some conflicts in the evidence below as to when the counter-complainants first became aware of the facts upon which their claims are based, but certainly it could not be held as a matter of law that they slept on their rights.

In short, the critical decision in this case was for the trier of the facts, and could not be resolved on the basis of sufficiency as a matter of law. We hold that the chancellor erred in granting Mercantile's motion to dismiss.

## The Testimony of Appellants' Experts

A further question for our review is whether the chancellor abused his discretion in striking the testimony of John N. Menges and George Weinstein, expert witnesses for appellants. At the trial, it was proffered that Mr. Menges would give his opinion as to the cost of reproducing Pimlico Race Track as it existed in 1947, and that Mr. Weinstein would give his opinion as to the "going concern" value of the Hammond Trust's interest in Pimlico. The chancellor ruled that although both witnesses were qualified as experts in their fields, he would admit their testimony subject to general exceptions because it was not clear, at the time of the proffers, that these witnesses had sufficient knowledge of the particular property in question to render an opinion useful to a trier of fact.[3] In his oral opinion of 27 June 1973, the chancellor granted Mercantile's motion to strike the testimony of both witnesses.

---

3. Audrey Cosden, Michael Madden and Christina Madden argue that the chancellor admitted the testimony of Mr. Menges subject only to a reservation as to the weight it would be given. The transcript, however, shows that the chancellor almost immediately retracted that ruling and admitted Menges' testimony subject to a general exception.

In *State, Use of Stickley v. Critzer*, 230 Md. 286, 186 A. 2d 586 (1962), the Court of Appeals reviewed various methods for qualifying an expert witness. At 289-90, it said:

"This Court has had occasion to deal with expert and opinion testimony many times. Of the principles that have been enunciated in the cases from time to time, no two are more firmly established than (1) that an expert witness must predicate his opinion on premises of facts, and (2) that the questions of the qualifications of an expert and whether or not his opinion will help the trier of facts appreciably are largely in the discretion of the trial court.

"The premises of fact may, or may not, include some of the reasons upon which the expert bases his opinion. And they must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient basis to support a rational conclusion is shown. The opinion of an extremely competent real estate appraiser as to the value of a certain tract of land, for instance, would have little, if any, probative force, if the expert had never seen the tract and had no knowledge of its location, or the properties surrounding it. The premises of fact may be within the personal knowledge of the expert, or an assumed set of facts (resulting in a hypothetical question). *Marshall v. Sellers*, 188 Md. 508, 519, 53 A. 2d 5. Ordinarily, the premises of fact are adduced before the expert is permitted to state his opinion. *Mangione v. Snead*, 173 Md. 33, 195 A. 329. However, they may be contained in a proffer of proof to follow, which proffer, of course, must be fulfilled, otherwise the opinion will be subject to a motion to strike it out. 32 C.J.S., *Evidence*, § 552."

And in *Casualty Insurance Co. v. Messenger*, 181 Md. 295, 29 A. 2d 653 (1943), the Court of Appeals said, at 298:

"It is a familiar rule of evidence that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate."

In reviewing the chancellor's conclusions that both expert witnesses in the case before us lacked the requisite special knowledge to qualify as experts, we have examined the testimony of each of them which we summarize here.

It cannot be disputed that for the past 15 years, Mr. Menges has been one of the country's leading authorities with regard to the design and construction costs of race tracks. The issue here, however, is not bounded by the field of his expertise in general. It was proffered that Mr. Menges could estimate the cost of reproducing Pimlico Race Track as it existed in 1947. In gauging his qualifications we therefore look to his knowledge of this particular track at a specific period in its history. Mr. Menges admitted that he had no first hand knowledge of Pimlico in 1947, nor, for that matter, in 1973. He had not heard any testimony in the case, but based his opinion entirely on certain reports provided to him from Mercantile's files relating to the Hammond Trust.

The Court of Appeals in *Consolidated Mechanical Contractors, Inc. v. Ball*, 263 Md. 328, 283 A. 2d 154 (1971), said at 335-36:

"It is generally true that the opinion of an expert may not be based in whole or in part on the opinions, inferences and conclusions of other witnesses, *Jackson v. Jackson*, 249 Md. 170 (1968); *Mt. Royal Cab Co. v. Dolan*, 168 Md. 633 (1935); *Quimby v. Greenhawk*, 166 Md. 335 (1934), nor on reports and examinations of others if they contain only opinions, inferences or conclusions. *Penn-*

*sylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295 (1943); *Equitable Life Assur. Soc. v. Kazee*, 257 Ky. 803, 79 S.W.2d 208 (1934); *Robertson v. Coca Cola Bottling Co.*, 195 Ore. 668, 247 P. 2d 217 (1952). *See also* 2 Wigmore, *Evidence* § 657 (3d ed. 1940); *McCormick on Evidence* § 15 (hornbook series 1954); 31 Am. Jur. 2d *Expert and Opinion Evidence* § 42 (1967); 19 A.L.R.3d 1008. But it is true also that an expert witness who has heard the entire testimony in a case and who assumes the truth of it all, where it is not conflicting, may base his opinion upon *facts* testified to by other witnesses, or upon *facts* contained in reports or examinations made by third parties. *Wilhelm v. Burke*, 235 Md. 412 (1964); *State ex rel. Solomon v. Fishel*, 228 Md. 189 (1962); *Ihrie v. Anthony*, 205 Md. 296 (1954); *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse*, 187 Md. 375 (1946); *Langenfelder v. Thompson*, 179 Md. 502 (1941). Admittedly it is often hard to draw the line between fact and opinion. The usual objection seems to be based on the premise that hearsay will be the foundation of the opinion. While there is considerable authority to the contrary we think there is support for the view that such opinion evidence, in some circumstances, may be admissible, for instance where such reports are relied on by the expert in the practice of his profession. *See McCormick on Evidence* § 15 (hornbook series 1954), and 3 Wigmore, *Evidence* § 688 (Chadbourn rev. 1970)."

Where an expert relies on reports of others, he must demonstrate to the court not only that the reports were made in a reliable manner, but that they are reliable sources of information for the purposes to which the expert puts them.

Mr. Menges relied almost exclusively on insurance appraisals of Pimlico Race Track made in 1928, 1937, and

1946 to determine what improvements existed at the track in 1947. The appraisals did not purport to show all of the improvements, did not purport to show what those improvements were constructed of, i.e., brick, wood, steel, nor did they purport to show the condition of those improvements in 1947. Mr. Menges admitted he had no personal knowledge of the reliability of the firms making the appraisals, nor could he supply any of the information lacking in those reports. He recognized that there were discrepancies among the reports, and, since he had no means of ascertaining which report was accurate, he averaged the appraised values in the reports.

The one report which was prepared for the purpose of ascertaining replacement costs of Pimlico Race Track was not relied on by Mr. Menges, but was rather attacked by him. Mr. Menges disregarded the allowance for depreciation as reflected in that report on two theories. First, since Pimlico was drawing large crowds, any obsolescence in the design must have been an attraction rather than a depreciation in the value of the buildings. This statement only further evidences a lack of knowledge of the track as it existed. It does not take into account that people may have been attracted in spite of the inconveniences, or that even larger crowds might have been attracted if those inconveniences were eliminated, and it flies in the face of evidence by other witnesses and testimony that *because* of its obsolescence, there were serious proposals in official circles to discontinue racing at Pimlico Race Track.

Mr. Menges' second reason for discounting depreciation was that he said that increased building costs offset any depreciation. Thus in estimating replacement costs he treated the improvements as new in 1947. While it is true that in some cases increased costs will offset depreciation, it does not follow that all buildings should be valued at what they cost, regardless of their age or condition, especially when Mr. Menges had already attempted to adjust his figures to reflect current 1947 costs. It has long been the rule in Maryland that valuations by real estate experts that do not reflect depreciation of the property are inadmissible.

*Stickell v. City of Baltimore*, 252 Md. 464, 250 A. 2d 541 (1969).

Without deciding whether Mr. Menges was proffered as a real estate expert to give a fair market value for the property, we conclude he could be of no assistance to a trier of fact in estimating the replacement costs of the improvements at Pimlico Race Track as they existed in 1947. He treated all of the improvements as new when in fact they were not and he used the reports of others without making the requisite showing of reliability. We can find no abuse of discretion by the chancellor in striking his testimony.

Appellants' second expert witness, Mr. Weinstein, is an expert in the field of race track accounting. Although it was proffered that Mr. Weinstein would testify as to the fair market value of the Hammond Trust's interest in Pimlico Race Track as a going concern, he approached his task by totally ignoring the Jockey Club's interest in the operation of the race track. On cross examination, when asked what value he attributed to the Jockey Club assets, the amount to be deducted from the fair market value of the total entity, Mr. Weinstein's repeated answer was zero or none. He gave no consideration to the fact that if Pimlico had a reputation as a great race track, part of that reputation should have been attributed to the group that had managed and operated the track for the 70 odd years of racing at Pimlico.

Essentially, Mr. Weinstein's approach was to examine other race track operations in the country in 1947. By comparing those tracks' profits against the price of the stock in those tracks, he arrived at a figure which he thought was a conservative multiple to be applied to the profits of Pimlico. He then adjusted the profit reports of the Jockey Club for 1944, 1945, and 1946, to eliminate excess profit taxes and rents, and to add back in certain items which he considered to be capital expenses. Even if we assume that Mr. Weinstein's method was reliable from the standpoint of good accounting procedures (we assume they were since Mr. Weinstein was eminently qualified), the witness himself admitted that certain calculations were based on intuition and others were wrong. These admitted errors affected both

sides of Mr. Weinstein's comparisons. Because of them, it became unclear what multiple, if any, was appropriate, and if a proper multiple could be determined, to what profit dollar figure it should apply.

Perhaps one of the most difficult aspects of ascertaining the value of the Hammond Trust's interest in Pimlico Race Track was the weight to be given the fact that while the trust apparently owned the right to the name Pimlico, the Jockey Club owned all interests in the names Preakness, The Futurity, The Dixie Handicap, and those of other famous races run at the track. When asked what effect the absence of these drawing attractions might have on the value of Pimlico as a race track, Mr. Weinstein responded that he did not consider that factor at all. He said he thought an interesting question was whether those races were great because they were run at Pimlico, or whether Pimlico was great because those races were run there. The chancellor apparently thought the question was not only interesting but indeed basic to the question of the value of the Hammond Trust's interest in Pimlico. Because Mr. Weinstein failed to give any consideration to such factors, the chancellor felt his testimony could be of no assistance to a trier of fact trying to make that determination. We agree and find that there was no abuse of discretion by the chancellor in striking his testimony.

### Charging the Cost of Monitoring Inspection

The trial court's order of 13 February 1973 authorized inspection of Mercantile's trust records by the appellants, and directed that the costs of monitoring the inspection be prorated among the participating parties. Appellant Peter Madden urges here that the beneficiaries should not have been charged with the salary of the employee whom Mercantile assigned to oversee the inspection. He argues that this assessment had the effect of allowing double compensation to the Trustee, and, therefore, constituted an abuse of discretion by the chancellor.

The beneficiaries of a trust have an inherent right to

inspect the records of a trustee, as those records relate to the beneficiaries' interests. *Baer v. Kahn,* 131 Md. 17, 28-29, 101 A. 596 (1917). And the trust relationship imposes upon a trustee the complementary duty of making his records available for the beneficiaries' inspection. A trustee, however, also has the right to extra compensation for extra services, in the discretion of the court. *Sokol v. Nattans,* 26 Md. App. 65, 337 A. 2d 460 (1975); III Scott, *Law of Trusts* 242.2 (3d ed. 1967).

By his order, the chancellor determined that under the circumstances here, monitoring the inspection of the trust records involved extraordinary expenses beyond those ordinarily compensated for by a trustee's commission. We cannot say that in ordering the proration of costs among the participating beneficiaries the chancellor abused his discretion. He retains, of course, the authority to rule on the reasonableness of the actual costs incurred when Mercantile submits its claim.

### Charging Mercantile's Expenses and Counsel Fees

In view of our holding that the chancellor erred in granting Mercantile's motion to dismiss, his order deciding, in principle, that Mercantile shall be awarded costs, expenses, compensation and attorney's fees incurred in defending the counterclaim remains subject to reconsideration by the chancellor. The appropriateness of such an order will depend on the outcome on remand following a full hearing of the case on the merits.

Two contentions in this appeal merit further comment. They relate to Mercantile's employing two separate law firms and to the position of those beneficiaries who declined to join in filing the counterclaim.

Appellant Peter Madden asks this Court to rule as a matter of law that Mercantile should in no event be allowed counsel fees payable to two law firms. The cases from other jurisdictions on which he relies fall short of requiring the ruling he seeks. We read them to hold merely that in allowing attorney's fees a court will not be controlled by the

contract between a fiduciary and a law firm, nor will it award fees for a duplication of work by different attorneys. These principles are implicit in the limitation that an award of attorney's fees be reasonable.

With respect to Mercantile's expenses, including attorney's fees, the chancellor ordered that they "should be paid out of and charged pro rata against the respective distributive shares only of the counter complainants in the trust estate herein, and no part thereof shall be paid out of or charged against the shares of Anne Hallenbeck or Jane Humphreys." In oral argument here, appellants conceded that the beneficiaries named have not participated in prosecuting the counterclaim, and that, therefore, their shares should not be diminished by any costs of the countersuit, regardless of the outcome. The agreement of all of the parties on this point should be respected on remand if the chancellor determines at the conclusion of the hearing on the merits that the counter-complainants are to bear the costs of reasonable attorney's fees to Mercantile.

## The Commission Taken by Mercantile On The Sale

Our decision on the motion to dismiss requires that the order approving the taking of a 2% commission by Mercantile on the sale must remain subject to reconsideration by the chancellor. We do not mean to imply that the order was wrong in the context in which it was entered. Rather we recognize that if the case is decided against Mercantile on the merits the equitable considerations may change.

Appellants argue that at the time Pimlico was sold, Mercantile had no right to pay itself a commission without an appropriate court order, and therefore the 2% commission should now be disallowed. The chancellor heard arguments on this point. In an 11 July 1973 ruling he indicated that he need not decide whether submission to a court was necessary in 1947. The chancellor ruled that if the issue had been submitted to a court of equity, the 2% commission would have been approved.

The applicable statute appears as Section 199 (d) of Article 16 of the 1957 Annotated Code of Maryland, which is identical to the statute in force in 1947.[4] Section 199 sets forth certain commissions to which trustees were entitled for their administrative services, including in subsection (d):

> "For selling real or leasehold property, a commission upon the proceeds of such sale at such rate as may be allowed by rule of court or statute, to trustees appointed to make sales under decrees or orders of a court of equity in the county in Maryland where such real or leasehold property is situated . . . ."

Because Pimlico in 1947 was located in Baltimore City, the applicable rule of court was Rule 20 of the Equity Rules For Baltimore City. In essence, Rule 20 set out a sliding scale for commissions, allowing 2% on proceeds of sales above $25,000 and up to $50,000. Commissions on proceeds exceeding $50,000 were left expressly to the discretion of the court.

Neither the statute nor the rule required conventional trustees to submit their commissions to courts of equity for approval. We interpret them to permit conventional trustees, on their own initiative, to take commissions in conformity with those allowed to trustees appointed to make sales under decrees or orders of courts of equity.

In *Sokol v. Nattans, supra,* Chief Judge Orth for this Court reviewed the law in relation to commissions as authorized under trust instruments and the applicable Maryland statutes. In essence, he said that a trust is a contract and that the intent of the parties to that contract is binding. It is clear that Mr. Hammond intended that the trust be administered by Mercantile free of court supervision. We therefore find nothing in the instrument itself or in the statutes which required Mercantile to invoke the jurisdiction of a court for approval of commissions.

If a commission taken by a conventional trustee without

---

4. Article 16, § 280 of the 1939 Code.

court approval is challenged, as it was here, then the court must determine whether the commission taken was authorized by the instrument, or was within the limits allowed by statute, or was within the customary limits allowed by courts at the time.

Appellants also urge that if they should prevail after a full hearing on the merits, then the commission should be disallowed as a matter of law.

Where a breach of trust is established, it is within the discretion of the chancellor to reduce or deny commissions. *Stone v. Stone*, 230 Md. 248, 186 A. 2d 590 (1962). Such a reduction or denial, however, is not mandated as a matter of law, as appellants contend; rather it is within the discretion of the chancellor. The reduction or denial of commissions is ordered, not for the purpose of imposing a penalty upon the trustee for his breach of trust, but on the ground that he has not properly performed the services for which he is compensated. III Scott, *Law of Trusts*, § 243 (3d ed. 1967). Thus in many jurisdictions courts have allowed commissions even where there was a breach of trust. In *Diffenderffer v. Winder*, 3 G. & J. 311 (1831), the Court of Appeals reduced a commission to one half of what the chancellor allowed. The Court, however, did not deny commissions totally, even though it found an egregious breach of trust.

## Dismissal of the Jockey Club

The motion to amend the mutual dismissal by the appellants and the Jockey Club raised before the chancellor the question whether he should exercise the court's revisory power under Maryland Rule 625 to modify a mutual order of satisfaction and dismissal which originated with the parties. A hearing was held, at which the intent of all parties to the order was shown. The chancellor made a finding as to the authority given by the parties to their counsel, and further found that the order did not go beyond the authority given. He found that there was no fraud, mistake, or irregularity, and thus no justifiable need to modify the order. His findings of intent and authority should bind all parties in

this case. He did not err in denying the motion to modify the order.

> *Order of 13 February 1973 affirmed.*
>
> *Decree of 23 May 1974 affirmed, except for that part which dismissed the counterclaim, which is reversed.*
>
> *Order denying motion to modify order of dismissal of Jockey Club affirmed.*
>
> *Case remanded for further proceedings in accordance with this opinion.*
>
> *Costs below to abide the result.*
>
> *Costs in this Court to be paid three-fourths by Mercantile-Safe Deposit and Trust Company, and one-fourth by appellants, except for the brief of appellees Humphreys and Hallenbeck, who shall pay for their own brief.*